530

1    PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

2    Name SOEUN        SAL        S. S
     (Last)            (First)        (Initial)                    JAN 1 6 2008

3    Prisoner Number P-53393

4    Institutional Address Pelican BAY STATE PRISON NORTHERN CLERK DISTRICT COURT CALIFORNIA

5    P.O. BOX 7500, Crescent City, Ca 95532

6    ================================================
                  UNITED STATES DISTRICT COURT
7                NORTHERN DISTRICT OF CALIFORNIA

8    SAL SOEUN            CV 08            0294
     (Enter the full name of plaintiff in this action.)

9
                      vs.                     )    Case No. _____
10   R.A HOPEL                                )    (To be provided by the clerk of court)
                                              )
11   _____                )    PETITION FOR A WRIT
                                              )    OF HABEAS CORPUS
12   _____                )
                                              )
13   _____                )
                                              )
14   (Enter the full name of respondent(s) or jailor in this action)  )
                                              )
15   ================================================================

16                    Read Comments Carefully Before Filling In

17   When and Where to File

18        You should file in the Northern District if you were convicted and sentenced in one of these

19   counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20   San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21   this district if you are challenging the manner in which your sentence is being executed, such as loss of

22   good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23        If you are challenging your conviction or sentence and you were not convicted and sentenced in

24   one of the above-named fifteen counties, your petition will likely be transferred to the United States

25   District Court for the district in which the state court that convicted and sentenced you is located. If

26   you are challenging the execution of your sentence and you are not in prison in one of these counties,

27   your petition will likely be transferred to the district court for the district that includes the institution

28   where you are confined. Habeas L.R. 2254-3(b).

     PET. FOR WRIT OF HAB. CORPUS          - 1 -

1  Who to Name as Respondent

2      You must name the person in whose actual custody you are. This usually means the Warden or

3  jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced. These are not proper

5  respondents.

6      If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11      1. What sentence are you challenging in this petition? MY CONVICTION.

12          (a)    Name and location of court that imposed sentence (for example; Alameda

13              County Superior Court, Oakland):

14          Superior court of stanislaus County.    MODESTO

15              Court                  Location

16          (b)    Case number, if known  188396

17          (c)    Date and terms of sentence  9/24/99, 27yrs  2months

18          (d)    Are you now in custody serving this term? (Custody means being in jail, on

19              parole or probation, etc.)      Yes X    No _____

20              Where?

21              Name of Institution: PELICAN BAY STATE PRISON

22              Address: P.O. BOX 7500 crescent city, Ca 95532

23      2. For what crime were you given this sentence? (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known. If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  Robbery-PC 182/212.5.213, Attempt Robb-PC 664/211.213, Burglary-PC 459,

27  GBI-PC 245(a)(2), Discharging firearm-PC 246, Street GANG-PC

28  186.22(a)

3. Did you have any of the following?

    Arraignment:                             Yes ✗      No _____

    Preliminary Hearing:                  Yes ✗      No _____

    Motion to Suppress:                  Yes _____    No ✗

4. How did you plead?

    Guilty _____    Not Guilty ✗    Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury ✗    Judge alone_____    Judge alone on a transcript _____

6. Did you testify at your trial?                  Yes ✗      No _____

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment                Yes ✗      No _____

    (b)    Preliminary hearing         Yes ✗      No _____

    (c)    Time of plea              Yes ✗      No _____

    (d)    Trial                     Yes ✗      No _____

    (e)    Sentencing               Yes ✗      No _____

    (f)    Appeal                   Yes ✗      No _____

    (g)    Other post-conviction proceeding    Yes _____    No ✗

8. Did you appeal your conviction?         Yes ✗      No _____

    (a)    If you did, to what court(s) did you appeal?

                Court of Appeal           Yes ✗      No _____

                Year: 10/25/99    Result: RESENTENCE

                Supreme Court of California    Yes _____    No _____

                Year: _____    Result: _____

                Any other court           Yes _____    No ✗

                Year: _____    Result: _____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

| | | petition? | Yes _____ | No X |
|1| | petition? | Yes _____ | No X |
|2| (c) | Was there an opinion? | Yes X | No _____ |
|3| (d) | Did you seek permission to file a late appeal under Rule 31(a)? | | |
|4| | | Yes _____ | No X |

If you did, give the name of the court and the result:

_____

_____

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court (state) or federal?        Yes X        No _____

[Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. §§ 2244(b).]

(a)    If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

    I.    Name of Court: Superior Court of Stanislaus County
          Type of Proceeding: State Writ of Habeas Corpus
          Grounds raised (Be brief but specific):
          a. Petitioner recieve ineffective Assistance of counsel- (cont.)
          b. _____
          c. Where a confession is induce as a result of coercion- (cont.)
          d. Double Jeopardy in regard to being charge - (cont.)
          Result: Denied          Date of Result: 3/24/04 (see Appen.C) P.43

    II.   Name of Court: Fifth Appellate District Court
          Type of Proceeding: State Writ of Habeas Corpus
          Grounds raised (Be brief but specific):

cont...

.d(I)

→ Where he failed to file a motion To supress an alleged
   Confession, violating Petitioner's 5th, 6th and
   14th Amendment to the U.S. Constitution.

c(II).
→ violates the 5th and 14th amendment, and render
   the Procedural requirement of Miranda INvoluntarily
   and unknowingly waived.

d(III).
→ Sentence twice for the same crime/charge.

(Pg. 4)

a(I).

→ where he failed to file a motion to supress an alleged Confession, violating Petitioner's 5TH, 6TH and 14TH Amendment to the U.S. Constitution.


b(II).

→ coercion, violates the 5TH and 14TH Amendment, and render the Procedural requirement of miranda Involuntarily and unknowingly waived.


c(III.)

→ twice for the same charge.


Pg. 5

cont...

a(I)
→ where he failed to file a motion to supress an alleged confession, violateing Petitioner's 5TH, 6TH and 14TH amendments to the U.S Constitution.

b(II)
→ result of coercion, violates the 5TH and 14TH amendment, and render to Procedural requirement of miranda Involuntarily and unknowingly waived.

c.(III),
→ Twice for the same charge.

(pg.5)

# THE HABEAS CLAIMS TABLE

GROUND 1: CASE AUTH. STRICKLAND V. WASHINGTON, 66 U.S. 668 (1984)

PETITIONER RECIVER INeffectIVE ASSISTANCE OF COUNSEL. WHERE HE FAILS TO FILE A MOTION TO SUPPRESS AN ALLEGE CONFESSION. THIS VIOLATE PETITIONER's 5th, 6th AND 14 AMEND. RIGHTS TO THE U.S CONSTITUTION. Subd.(B) COUNSEl DEFICIENT... ELECTING NOT TO FILE A MOTION TO SUPPRESS... VIOLATE PETITIONER'S DUE PROCESS... 5th, 6th and 14th AMEND.

GROUND 2: CASE AUTH. NORTH CAROLINA V. BUTLER, 441 U.S. 369, 373, 99 S. Ct.

WHERE A CONFESSION IS INDUCED AS A RESULT OF COERCION.
THIS VIOLATE PETITIONER's 5th, 6th AND 14th AMEND. AND RENDERS THE PROCEDURAL REQUIREMENT OF MIRANDA INVOLUNTARY AND UNKNOWINGLY WAIVE. Subd.(A) Subd.(B) COERCIVE AND DECEITFUL TAG-TEAM TACTICS WAS USED BY OFFICER TO OBTAIN A CONFESSION, THAT VIOLATE PETITIONER DUE PROCESS.

GROUND 3: CASE AUTH: NORTH CAROLINA V. PEARCE, 345 U.S 711

On Count ONE AND TWO IS A Double JEOPARDY CASE.
CALIF. LAW PROHIBITS A PERSON FROM BEING CHARGE with the SAME CRIME NOMATTER HOW THEY ARE WRITTEN. WHICH VIOLATE PETITIONER'S 5th AMEND. RIGHT TO DUE PROCESS.

1    need more space. Answer the same questions for each claim.

2    [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3    petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4    499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5    Claim One: PETITIONER RECEIVE ineffective ASSISTANCE of COUNSEL WHERE

6    He FAILE to FILE A MOTION to SUPPRESS AN ALLEGED CONFESSION.

7    Supporting Facts: PETITIONER TRIAL COUNSEL FAIL to SUPPRESS AN ALLEGED

8    confession. WHICH VIOLATE petitioner 5th, 6th and 14th Amendment

9    to the U.S. Constitution. Defense Counsel RENDERED ineffective

10    ASSISTANCE of COUNSEL WHEN he FAILE to CONDUCT A PRE-TRIAL → (cont.) Pg7of6

11    Claim Two: PETITIONER CONFESSION IS THE RESULT

12    of COERCION. VIOLATES the 5th AND 14th AMENDMENT.

13    Supporting Facts: PETITIONER WAS ARRESTED MARCH 28, 1998

14    AND WAS SUBSEQUENTLY QUESTION BY DETECTIVE RELENTL-

15    -ESSLY. DESPITE REPEATEDLY INFORMING THE DETECTIVE

16    that he had nothing to do with this CRIME NOR had → (cont.) pg. 8,9,10 of 6)

17    Claim Three: DOUBLE JEOPARDY

18

19    Supporting Facts: ON COUNT ONE AND two IS A Double

20    JEOPARDY CASE. BECAUSE I HAVE BEEN SENTENCE

21    UNDER the SAME CRIME twice. California Law prohibits

22    A person FROM BEING CHARGE with the SAME CRIME → (cont. pg. 11 of 6)

23    If any of these grounds was not previously presented to any other court, state briefly which

24    grounds were not presented and why:

25    _____

26    _____

27    _____

28    _____

PET. FOR WRIT OF HAB. CORPUS        - 6 -

Cont: Claim one:

-402 HEARING TO "SUPPRESS" the ALLEGED confession.

Counsel Decision not to pursue the pre-trial

motion to suppress was neither strategical nor

tactical advantage to the petitioner. Defense counsel

performance was deficiently and that the deficient

performance prejudice the defense so as to deprive

the petitioner of a fair trial. The fact is, Defense

counsel Decision not to pursue the pre-trial

"Motion to Suppress" prove more harmful than

Helpful, merely because the "ONLY EVIDENCE"

link petitioner to the ALLEGED incident, was his

own ADMISSION of involvement.

Pg. 7 of (Pg. 6)

cont. CLAIM NO.

— Any knowledge in this crime. There was two
round of questioning; During the first round of
questioning and repeatedly "SCARE-TACTICS" utilize by
the Detective on petitioner AND Despite these
"SCARE-TACTICS" petitioner Admitted NO involvement
in this crime. However, while Being held at the
police station petitioner was purposely permitted to
hear specific Details of the crime through
conversation other suspect was having with
Detective in Another Room. This first interrogation
lasted for Hours on March 28, 1998.

Second interrogation commence about
An Hour after the first ENDED.

cont....

Pg. 8 of (Pg. 6)

Cont. Claim two: supporting fact.

- Petitioner was never permitted water, coffee, food of no kind nor was permitted access to a bathroom. Finally, hours of relentless questioning, petitioner began to admit involvement in this crime. Petitioner admitted involvement only because, it was his understanding that if he'd cooperate with the police during this second interrogation that the police would allow petitioner to go home that night. Petitioner gave the police officer what he thought that they wanted to hear. It is important to not that "Nothing that petitioner admitted to that night was supported by any physical evidence".

Cont...

Pg. 9 of (Pg. 6)

cont. claim + no supporting fact.

PETITIONER WAS Mentally influence BY DETECTIVE to BELIEVE that if he gave them what they wanted he would be permitted to go home. this in connection with the fact that petitioner was DERIVE of all BASIC HUMAN NEEDS RENDER A COERCE CONFESSION. Which violates the 5th AND 14th AMENDMENT, AND RENDERS the procedural requirement of MIRANDA INVOLUNTARILY AND unknowingly WAIVED.

Pg.10 of (Pg.6)

CONT. CLAIM three SUPPORTING facts:

NO MATTER How they are written.
Count one is Being written AS A conspiracy to commit
A Home invasion Robbery, while count two is written
AS commiting A Home invasion Robbery.
which is the SAME exact CHARGE SO, Double
JEOPARDY should Apply to this CASE.

(Pg. 11 of 6)

1        List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3    of these cases:

4    Strickland V. Arizona, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d

5    674 (1984). Powell V. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77

6    L.Ed. 158 (1932) cont. Pg. 8 of 7

7    Do you have an attorney for this petition?        Yes_____     No _X_

8    If you do, give the name and address of your attorney:

9    _____

10       WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11   this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13   Executed on  12-30-07                    _Sof Scion_

14             Date                    Signature of Petitioner

15

16

17

18

19

20   (Rev. 6/02)

21

22

23

24

25

26

27

28

# CONT. CASE CITATIONS

Johnson V. Zerbst, 304 U.S 458, 58 S.Ct. 1019, 82 L.ED 1461.

Adams V. United States, ex rel. McCann, 317 U.S. 269, 275, 276, 63 S.Ct. 236, 240, 87 L.ED. 268 (1942)

Brecht V. Abrahamson, 113 S.Ct. 1710, 1721, 123 L.ED. 2d 353.

Cuyler V. Sullivan, supra 446 U.S., at 346, 90 S.Ct., at 1717.

Miranda V. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.ED. 2d. 694 (1966)

Fare V. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.ED. 2d 197 (1979)

North Carolina V. Butler, 441 U.S 369, 373, 99 S.Ct. 1755, 1757 60 L.ED. 2d 286 (1979)

Culombe V. Connecticut, 367 U.S 568, 402, 81 S.Ct. 1860, 1879 6 L.ED. 2d 1037 (1961)

(Pg. 8 of 7)

Cont. CASE citation

United State V. Chalan, 812 F.2d 1302, 1307-1308(10th cir.)1987,

Mincey V. Arizona, 437 U.S. 385, 398-402, 98 s. ct. 2408,

2416, 18, 57 L.ED.2d 290(1978).

Roger V. Richmond, 365 U.S., at 540-541, 81 S.ct, at 739-740;

(pg.9 of 7)

# SUPPORTING DOCUMENTS

APPENDIX (A): SUMMARY OF ARGUMENT... Pg. 1-3

MEMORANDUM POINTS AND AUTHORITIES... Pg. 4-31

## CONTENTIONS

I.
PETITIONER RECIEVE INEFFECTIVE ASSISTANCE OF COUNSEL... Pg. 4-11

II.
WHERE A CONFESSION IS INDUCED AS A RESULT OF COERCION... Pg. 12-31

PRAYER FOR RELIEF... Pg. 32

VERIFICATION... Pg. 33

APPENDIX (B):
APPELLATE COURT OPINION... Pg. 34-36
APPELLATE COURT SECOND OPINION... Pg. 37-42

APPENDIX (C):
PETITIONER HABEAS CORPUS MOTION OF DISMISSAL FROM
THE SUPERIOR COURT OF CONVICTION... Pg. 43

APPENDIX (D):
PETITIONER HABEAS CORPUS MOTION OF DISMISSAL FROM
FIFTH APPELLATE DISTRICT COURT... Pg. 44

APPENDIX (E):
PETITIONER HABEAS CORPUS DISMISSED FROM THE
SUPERIOR COURT THE SECOND TIME... Pg. 45-48

APPENDIX (F):
PETITIONER HABEAS CORPUS MOTION OF DISMISSAL
FROM THE APPELLATE DISTRICT COURT THE SECOND TIME... Pg. 49

# I.

# SUPPORTING DOCUMENT

## APPENDIX (G):

PETITIONER HABEAS CORPUS DISMISSAL FROM THE SUPREME COURT. . . . Pg. 50

## APPENDIX "H":

STATEMENT of SAL SOEUN DURING FIRST POLICE INTERROGATION . . . Pg. 51

## APPENDIX "I":

STATEMENT of SAL SOEUN TESTIFYING ON HIS OWN BEHALF . . . . Pg. 82-91

## APPENDIX "J":

STATEMENT of FACT AND BACKGROUND Of SAL SOEUN . . . . Pg. 92-95

## APPENDIX "K":

STATEMENT of SAL SOEUN DURING SECOND POLICE INTERROGATION. . . Pg. 96-122

II.

a. _____ _____ RECIEVE INEFFECTIVE ASSISTANCE of
b. _____ _____ SSION IS INDUCE AS A RESULT- (cont)
c. _____ _____ PDY" IN REGARDING TO BEING
d._____

Result: _____ Date of Result: June 29/04 (SEE APPEN
"DIP"
B44

III.   Name of Court: _____ nia Supreme Court

Type of Proceeding: _____ TE WRIT of HABEAS CORPUS

Grounds raised (Be brief but specific):

a. _____ _____ INEFFECTIVE ASSISTANCE of COUNSEL -cont.
b. _____ _____ ON IS INDUCE AS A RESULT of - cont.
c. _____ _____ y" INREGARDING to BEING CHARGE-cont.
d._____

Result: _____ Date of Result: AUG. 22-07
(SEE APP'G" Pg.50)

IV.   Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a. _____
b. _____
c. _____
d. _____

Result: _____ Date of Result:_____

(b)   Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes _____   No __X__

Name and location of court: _____

B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

# APPENDIX
# FILE



(1)

## SUMMARY OF ARGUMENT

1. In **Strickland V. Washington**, the Court agreed that the Sixth Amendment imposes on Counsel a duty to investigate, because reasonably effective assistance must be based on professional decisions and informed legal choices can be made only after investigation of options. The Court observed that Counsel's investigatory decisions must be assessed in light of the information known at the time of the decisions, not in hindsight, and that "[t]he amount of pretrial investigation that is reasonable defies precise measurement."

Petitioner allege's that trial Counsel failed to file a "motion to suppress" incriminating statements made to law enforcement officers after his arrest on March 27,1998.

In **Miranda V. Arizona**, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the Court stated that "where the uncounseled statement is involuntary, and thus a product of inherently coercive police tactics or methods offensive to due process...there is a Fifth Amendment violation and the fruits may be inadmissible in the prosecutor's case in chief." And further, statements not obtained in violation of Miranda may still be suppressed as violative of due process if the statements are "coerced" or involuntary."

Defense Counsel provided deficient performance and tactical error when he failed to suppress petitioner's alleged confession given to Detective Brocchini. Counsel knew that "coercive police activity is a necessary predicate to the finding that a confession is not voluntary, and that a statement is coerced or involuntary if the action of the "law enforcement officials was such as to overcome the will to resist and bring about a confession not freely self-determined."

2. In **Miranda**, the Court stated that reviewing the totality of the circumstances, it is important to remember that an explicit statement of waiver is not invariably necessary to support a finding that a Defendant has waived his right to remain silent.

The voluntariness of a confession is determined by considering the totality of the circumstances in which it was made. We must ask:

> Is the confession the product of an essentially free and unconstrained choice by it's maker? If it is, if he has willed to confess, it may be used against him, if is it not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

The totality approach permits--indeed it mandates--inquiry into all the circumstances surrounding the interrogation.

This includes evaluation of the defendant's age, experience, education, background, and intelligence, and into whether he has the capacity to under-stand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

In the present case, petitioner's 5th, 6th, and 14th Amendment was violated, when arresting officers used improper police tactics to elicit incriminating statements from petitioner. The officers used coercive measure's such as deprivation of sleep, inappropriate pressure, length of deten-tion, and trickery to induce a confession that would have been knowingly used as evidence to support a conviction.

In **Miranda V,Arizona**, the Court recognized that custodial interrogations, by their very nature, generate "compelling pressures which work to undermine the individuals will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S., at 467, 86 S.Ct., at 1624.

To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, Miranda imposed on the police an obli gation to follow certain procedures in their dealings with the accused... And in the present case, Detectives failed to follow police procedures required by Miranda, and chose to use improper methods in obtaining petitio er's incriminating statements.

I.  PETITIONER RECEIVED INEFFECTIVE ASSISTANCE
OF COUNSEL, WHERE HE FAILED TO FILE A MOTION
TO SUPPRESS AN ALLEGED CONFESSION, VIOLATING
PETITIONER'S 5TH, 6TH, AND 14TH AMENDMENT TO
THE U.S. CONSTITUTION.


A.  A claim of ineffective assistance of Counsel is a mixed question
of law and fact reviewed de novo. **Span**, 75 F.3d 1383,1387 (9th Cir.1996).
It may be raised for the first time on a § 2254 motion. Id.
To prevail on a claim of ineffective assistance of counsel, it must be show
that: **(1)** his attorney performance was unreasonable under prevailing pro-
fessional standards; and **(2)** there is a reasonable probability that but
for counsel's unprofessional errors, the result would have been different.
Id. A reasonable probability has been defined as "a probability sufficient
to undermine confidence in the outcome." Id. (Citing **Strickland V. Arizona**,
**466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).** failure to make
the required showing on either prong "defeats the ineffectiveness claim."
**Strickland, 466 U.S. at 700, 104 S.Ct. 2052.**

Petitioner assert's that Defense Counsel rendered ineffective assist-
ance of Counsel, when he failed to conduct a pre-trial 402 hearing to
"suppress the alleged confession."
Prior to trial defense counsel was well aware that the investigating office-
r's Mr. Brocchini and Bertalotto, had alleged in their report that petiti-
oner had in fact confessed to them, about his participation in the crime.
If there is only one plausible line of defense, counsel must conduct a "rea-
sonably substantial investigation" into that line of defense, since there
can be no strategic choice that renders such an investigation unnecessary.
The same duty exists if counsel relies at trial on only one line of defense,
although others were available. In either case, the investigation need not
be exhaustive. It must include "an independent examination of the facts,

pg. (4)

(4)

circumstances, pleadings and laws involved." The scope of the duty, however depends on such facts as the strength of the prosecution's case and the likelihood that pursuing certain leads may prove more harmful than helpful.

In the present case, defense counsel's decision not to pursue the pretrial "motion to suppress," proved more harmful than helpful merely beca se the "only" evidence linking petitioner to the alleged incident, was his own admission of involvement.

Counsel's decision not to pursue the pretrial motion to suppress was neithe strategical or tactical advantage to the petitioner. In fact, his performan was deficient and that the deficient performance prejudiced the defense so as to deprive the petitioner of a fair trial.

Petitioner was arrested on March 27,1998, Count I: Violation of sect ion 182/212.,213 of the penal code, Count II: Violation of section 664/211 213 of the penal code, Count III: Violation of section 459 of the penal code, Count IV: Violation of section 246 of the penal code. He was subseque tly found guilty by jury and sentenced to 29 years to state prison. The police report alleged that petitioner was arrested at the "Doctors Medi cal Center, on suspicion to commit a felony, and was interrogated by the investigating officers.

During the initial interview of petitioner after waiving his Miranda rights to remain silent, he denied involvement throughout the entire interview. Unsatisfied that petitioner denied involvement officer Brocchini conducted a second interrogation, where petitioner confessed to being present during the alleged crime.

Petitioner allege's that the interrogating officer's used coercive tactics to elicit incriminating statements from petitioner, and had defense counsel moved to suppress the confession based on coercion by officer Brocc hini, petitioner would not have been found guilty, since the only evidence

was petitioner's incriminating statement.

defense Counsel was well aware that statements not obtained in violation

of Miranda may still be suppressed as violative of due process if the state

ments are "coerced" or involuntary."

The prosecution used the tape recorded confession in order to obtain a conv

ction, since there were little evidence if none at all that pointed to

petitioner.

In **Strickland V. Washington**, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2

674 (1984), that court announced a long line of cases that includes **Powell**

**V. Alabama**, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), **Johnson V. Zerbs**

304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and **Gideon V. Wainwright**

372 U.S. 335, 83 S.Ct. 792, 9 L.ed.2d 799 (1963), this court has recognized

that the Sixth Amendment right to counsel exist's, and is needed, in order

to protect the fundamental right to a fair trial. The Constitution guarantee

a fair trial through the Due Process Clauses, but it defines the basic ele-

ments of a fair trial largely through the several provisions of the Sixth

Amendment, including the Counsel Clause:

> "In all criminal prosecutions, the accused shall enjoy
> the right to a speedy and public trial, by an impartial
> jury of the state and district wherein the crime shall
> have been committed, which district shall have been
> previously ascertained by law, and to be informed of
> the nature and cause of the accusation; to be confront-
> ed with the witnesses against him; to have compulsory
> process for obtaining witnesses in his favor, and to
> have the Assistance of Counsel for his defense."

Thus, a fair trial is one in which evidence subject to adversarial testing

is presented to an impartial tribunal for resolution of issues defined in

advance of the proceeding. The right to counsel plays a crucial role in

Pg. (6)

the adversarial system embodied in the Sixth Amendment, since access to
counsel's skill and knowledge is necessary to accord defendant's the "ample
opportunity to meet the case of the prosecution" to which they are entitled
**Adams V. United States**, ex rel. McCann, 317 U.S. 269, 275, 276, 63 S.Ct.
236, 240, 87 L.Ed. 268 (1942); See **Powell V. Alabama**, supra, 287 U.S. at
68-69, 53 S.Ct. 63-64.

> B.  Counsel's deficient performance in electing
> not to file a motion to suppress, rendered the
> trial fundamentally unfair, and violated petiti-
> oner's Due Process of the 5th,6th and 14th Amend-
> ment.

Prior to trial Counsel filed a "Discovery Motion" on behave of
petitioner, which was granted by the trial court, and all materials were
reviewed by counsel in preparation for trial. Therefore, it was totally
inexcusable and unprofessional for counsel not to have filed a "motion to
suppress" the alleged confession, especially right after counsel received
and thoroughly reviewed all discovery reports. Counsel's unreasonable perf-
ormance is further illuminated during the trial proceedings on direct exam
ination of petitioner, and then again during closing arguments.
The following exchange occurred between Counsel and petitioner:

By Defense Counsel: Q. Were you asked any questions as to whether
or not you were in fact involved in the incident that happened at 2005 Rive
Pine Court that night? By Detective Brocchini,

Defendant:      A. Yeah, did he ask me about was I involved?

Q. Yes.

A. Yes, he asked me about it.

Q. And what was your response?

A. Don't know.

Q. What do you mean by that? "I don't know"?

A. I wasn't there. I don't know what happened.

pg. (7)

Q. Okay. now, you had a second conversation with him and it began around 6:30, 7:00 in the morning. Correct?

A. Yes.

Q. Okay. first of all, prior to your first conversation at 4:30, had you gotten any sleep that morning?

A. No.

Q. Had you been given a cup of coffee?

A. No.

Q. During your second conversation, referring to the one that began around 6:30, 7:00 in the morning, did you change your story as to what you had stated to Detective Brocchini previously?

A. Yes.

Q. And why did you do that?

A. Because he asked me the same question and I told him that, "I don't know."

Q. And why did you tell him that if you were not there?

A. Cause he keep asking me the same question, like he said that, "I know you were there, just tell me what part you play-ed," something like that, and I told him that, "I don't know." **(SEE EXHIBIT 2,Pg.521-522)**

On redirect examination by Defense Counsel, the following exchange then occurred:

**By MR. MEEKS:**    Q. Mr.Soeun, was it your understanding that if you cooperated with the police during that second conversation that some-how you would go home that night?

A. Uh-huh. Yes.

Q. So it's your testimony that you tried to

Pg. (9)

(8)

give the police officers what you thought they wanted to hear in order so you can go home, is that correct?

A. Yes. (SEE EXHIBIT 2, Pg.553)

During trial Counsel's closing argument, he hints at police misconduct in obtaining petitioner's statement.
The following closing arguments by defense Counsel:

**By MR. MEEKS:** Closing arguments:   Analyze the statements, analyze the statements. Recall the testimony of the Defendant on the witness stand. Analyze every witness and I submit to you, based on this standard I just read to you: It is that state of the case which, after the entire compariso and consideration of all the evidence, leaves the minds of the jurors in that condition that they, they cannot say they feel an abiding conviction of the truth of the charge.

You have to have an abiding conviction in order to be certain. And that certainly cannot be based on what was allegedly said in the "wee hours of the morning, under pressure by a police officer" who Allegedly fit toge-
ther little pieces of the right statement at the right time, that cannot be--it cannot be based upon that based on the law, and I submit to you, ladies and gentlemen, as I told you earlier, you cannot convict my client beyond a reasonable doubt of these charges. (SEE EXHIBIT 2, Pg. 599-600.)

The mere fact that Counsel took up his Career as a Defense Attorney, and probably had taken on hundreds of case's give and take a few, had to know that a statement is coerced or involuntary if the action of the "law enforcement officials was such as to overcome the will to resist and bring about a confession not freely self-determined."
The prejudice that resulted from counsel's deficient performance, in failing to challenge the involuntary confession on a "motion to suppress", was that

pg. (9)

by it's admission at trial, provided the jury with it's only evidence linki⎮
petitioner to the alleged crime, causing a substantial and injurious effect
or influence on the jury's verdict. (Citing **Brecht V. Abrahamson,** _____
**U.S.** ___,_____, 113 S.Ct. 1710, 1721, 123 L.Ed.2d 353 (1993)).

   In **Strickland V. washington,** _____, the Court stated: Representatio⎮
of a criminal defendant entails certain basic duties. Counsel's function
is to assist the defendant, and hence counsel owes the client a duty of
loyalty, a duty to avoid conflicts of interest. SEE **Cuyler V. Sullivan,**
**supra, 446 U.S., at 346, 90 S.Ct., at 1717.**
From counsel's  function as assistance to the defendant derive the overarch-
 ing duty to advocate the defendant's cause and the more particular duties
to consult with the defendant on important decisions and to keep the defend-
 ant informed of important developments in the course of the prosecution.
Counsel also has a duty to bring to bear such skill and knowledge as will
render the trial a reliable adversarial testing process. SEE **Powell V. Alaba**
**ma,** 287 U.S. at 68-69, 53 S.Ct., at 63-64.

   Thus, a court deciding an actual ineffectiveness claim must judge
the reasonableness of counsel's challenged conduct on the facts of the part-
 icular case, viewed as of the time of counsel's conduct.
A convicted defendant making a claim of ineffective assistance must identify
the acts or omissions of counsel that are alleged not to have been the resul⎮
of reasonable professional judgment. The court must then determine whether,
in light of all the circumstances, the identified acts or omissions were
outside the wide range of professionally competent assistance.
In making that determination, the court should keep in mind that counsel's
function, as elaborated in prevailing professional norms, is to make the
adversarial testing process work in the particular case. At the same time,
the court should recognize that counsel is strongly presumed to have

rendered adequate assistance and made all significant decisions in the exer
cise of reasonable professional judgment.

And finally, petitioner assert's that his conviction must be revers
ed because counsel rendered ineffective assistance at trial.
Specifically, failing to fail a **"MOTION TO SUPPRESS"** the alleged confession
The record does support the allegations that trial counsel failed to conduc
a reasonable investigation into the matter warranting him to file a motion
to suppress petitioner's statement.

**II. WHERE A CONFESSION IS INDUCED AS A
RESULT OF COERCION, VIOLATES THE 5TH AND 14TH
AMENDMENT, AND RENDERS THE PROCEDURAL REQUIRE-
MENTS OF MIRANDA INVOLUNTARILY AND UNKNOWINGLY
WAIVED.**

The issue of whether a defendant waived his miranda rights is not
one of form, but rather whether the defendant in fact knowingly and volun-
tarily waived his rights delineated in the miranda case. **North carolina
V. Butler**, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979).
The fact of a knowing and voluntary waiver **is to be determined from a revie**
of the totality of the circumstances. **United States ex rel. Hall V. Direct-
or**, 578 F.2d 194, 196 (7th Cir.), cert. denied, 439 U.S. 958, 99 S.Ct.
360, 58 L.Ed.2d 350 (1978).
As the Supreme Court stated in **Fare V. Michael C.**, 442 U.S. 707, 725, 99
S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979):

> The totality approach permits--indeed it mandates--inquiry
> into all the circumstances surrounding the interrogation.
> This includes evaluation of the [defendant's] age, experi-
> ence, education, background, and intelligence, and into
> whether he has the capacity to understand the warnings
> given him, the nature of his Fifth Amendment rights, and
> the consequences of waiving those rights.

SEE also Johnson **V. Zerbst**, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed.
1461 (1938).

In reviewing the totality of the circumstances, it is important to
remember that an explicit statement of waiver is not invariably necessary
to support a finding that a defendant has waived his right to remain silent.
Butler, 441 U.S. at 373, 99 S.Ct. at 1757. The burden rests with the
prosecution to show waiver by a preponderance of the evidence, cf. **Lego** .-
**V. Twomey**, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972)

(The government must prove by a preponderance of the evidence that a confes
    ion was voluntary). Although the court must presume that the defendant
did not waive his rights, __Butler__, 441 U.S. at 373, 99 S.Ct. at 1757.

### A. BACKGROUND

In the present case, petitioner's confession to officer Brocchini,
and Bertalotto was not as a result of an voluntary and knowingly waiver
of his constitutional rights to remain silent, governed by __Miranda V. Ari-__
__zona__, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
Petitioner testified that on the 27th day of March 1998, him and some fri-
    ends, 8to 9 in all, were playing some Cambodian video games and gambling.
When a car drove into the parking lot (Occupied by friends) of the residence
where petitioner resided at the time, and informed petitioner along with
the others that a friend by the name KEO (a.k.a., Cano) was shot, and may
die if he is not taken to a hospital.
Petitioner stated and the evidence does support, that he and MOEUNG POTH
("MOP"), got into the car and saw (SOKHEAN KEO) bleeding profusely, and
proceeded to drive him to the "Doctors Medical Center" for treatment.

On March 27,1998, at approximately 9:00 PM., officers of the Modesto
Police Department were dispatched to 2005 River Pine Court, Modesto, in
response to a reported shooting at this address. A witness advised officers
when he was  driving by the intersection of Pine Tree Lane and River Pine
Court, that he observed four subjects wearing dark clothing running from
the area of 2005 River Pine Court, Modesto, towards a vehicle parked in
the area. The witness described the vehicle as a 1989 or 1990 light colored
Honda Accord, with tinted windows and a rear spoiler.

Approximately 20 to 25 minutes after the entry, officers received
information from Doctors Medical Center Emergency room that several individ-
    uals appeared at the emergency room with an individual who was the victim

of a gunshot wound. Officers responded immediately and detained two sub-

jects. As police officers were preparing to leave the hospital, hospital

security pointed out a vehicle with several occupants whisch had dropped

off KEO at the emergence room. The occupants inside the vehicle were also

placed into custody at that time.

On March 28, 1998, petitioner was interviewed by detective **ALLEN**

**BROCCHINI** and **BERTALOTTO**; in regards to the incident that took place on

March 27th.

Petitioner asserts that the interrogation tactics utilized by the investiga

ting officers, were coercive in nature and used deceitfully, in order to

elicit incriminating statements from petitioner.

Petitioner does concede that his miranda rights were read to him by officer

Brocchini during the first of two interview's, although, officer Brocchini

never once made sure that petitioner gave up those rights, before proceedin

to interrogate petitioner.

During the initial tape recorded conversation between petitioner and the

investigating officers, officer Brocchini proceeded to advise petitioner

of his miranda rights by stating:

      **BROCCHINI:** You have the right to the presence of an
Attorney before and during any questioning, do you understand that?

      **SOEUN:**    Yes.

      **BROCCHINI:** If you can't afford an attorney one will
be appointed for you free of charge before any questioning if you
want. Understand that?

      **SOEUN:**    Yes.

      **BROCCHINI:** Okay. Do you have any problem with ah,
taken to me today, just giving me--I've got a couple questions I need
to ask you? No problem?

      **SOEUN:**    Hunh-uh(negative) go ahead.

Officer Brocchini never asked petitioner does he waive those rights, to

(14)

speak to him (Officer Brocchini), all he was concerned with was advising petitioner that he had a right to remain silent, and that if he couldn't afford an attorney, one will be appointed.

Without assuring that petitioner gave up those rights, officer Brocchini lead petitioner to believe that despite his Miranda Admonishment, without asking does he give up those rights, that petitioner was obligated to answer questions from the interrogating officers; figuring since I was informed by him prior to the interview, that I wasn't being charged with anything- and my cooperation depend's on whether I go home or not. **SEE EXHIBIT 1, Pg. 1,2).**

    The rule the court established in Miranda is clear. In order to be able to use statements obtained during custodial interrogation of the accus-ed, the state must warn the accused prior to such questioning of his right to remain silent and of his right to have Counsel, retained or appointed, and asked; does he give up those rights, during interrogation. **384 U.S. at 473, 86 S.Ct., at 1627.** "Once [such warnings have been given, the subse-quent procedure is clear." **Ibid.**

The Fifth Amendment right to Counsel attaches and comes into play when an individual is subjected to custodial interrogation because at such times the privilege against compelled self-incrimination is jeopardized. **Miranda V. Arizona**, **Supra, 384 U.S. at 477-78, 86 S.Ct. at 1629-30.** Custod-ial interrogation was defined by the Court in Miranda as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." **Id. at 444,86 S.Ct. at 1612.**

In **Rhode Island V. Innis**, **446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (19-80),**the court further defined the term "interrogation" by holding that under Miranda, interrogation "refers not only to express questioning, but

also to any words or actions on the part of the police (Other than those
normally attendent to arrest and custody) that the police know are reason-
ably likely to elicit an incriminating response from the suspect."
The Court acknowledged that an express indication of a desire to waive the
Miranda rights followed closely by a statement could satisfy the relinquish
ment component for waiver. **Id.**, **384 U.S. at 475, 86 S.Ct. at 1628.**

Petitioner in this case was questioned on two different occasions:
The first one occurred during the early morning of March 28, at 4:32 Am,
and again at 6:37 Am hrs. of March 28, 1998.
At which time officer Brocchini advised petitioner during his **"First"** inter
view, of his Miranda rights without obtaining first that petitioner give
up his rights to remain silent, before interrogating petitioner.
Officer Brocchini violated petitioner's 5th, 6th and 14th Amendment rights
to remain silent, by not obtaining an expressed waiver by petitioner, but
instead asked petitioner do he have a problem with taken to him, and that
he just wanted to ask afew questions.

The Court noted in **North Carolina V. Butler**, **441 U.S., at 373, 99**
**S.Ct., at 1757,** that the question whether the accused waived his rights
"is not one of form, but rather whether the defendant in fact knowingly
and voluntarily waived the rights delineated in the Miranda case." Thus,
the determination whether statements obtained during custodial interrogatio
are admissible against the accused is to be made upon an inquiry into the
totality of the circumstances surrounding the interrogation, to ascertain
whether the accused in fact knowingly and voluntarily decided to forgo his
rights to remain silent and to have the assistance of counsel. **Miranda V.**
**Arizona**, **384 U.S., at 475-477, 86 S.Ct., at 1628-1629.**
The voluntariness of a confession is determined by considering the totality
of the circumstances in which it was made. **Schneckloth V. Bustamonte**, **412**

U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). To determine voluntariness, they asked:

> Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity t for self-determination critically impaired, the use of his confession offends due process.

Culombe V. Cnnecticut, 367 U.S. 568, ¢02, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961).

### B. Coercive and deceitful tag-team tactics was used by officer's to obtain a confession, that violated petitioner's Due Process

A number of factors must be considered in assessing whether a confes ion is voluntary. These factors include the age, intelligence, and educat- ion of the suspect; the length of the detention and questioning; the use or threat of physical punishment; whether Miranda safeguards were admini- stered; the accused's physical and mental characteristics; and the location of the interrogation. United States V. Chalan, 812 F.2d 1302, 1307-1308 (10th Cir.1987). The Court must also consider the conduct of the police officers. See Mincey V. Arizona, 437 U.S. 385, 398-402, 98 S.Ct. 2408, 2416- 18, 57 L.Ed.2d 290 (1978).

Petitioner allege that officer Brocchini and Bertalotto sought out to force petitioner into making incriminating statements whether they were true or not, by using coercive measure's such as "repeating the same quest- ions over and over, although, petitioner denied any involvement with the

incident.

During the first interrogation officer's continued to accuse petitioner
of involvement, and despite petitioner's open denial, officers utilized
different forms of deceitful questioning attempting to elicit a confession;
unconcerned that petitioner continued expressing "he don't know"; officer's
refusal to cut off questioning, instead, they sought out trying to overborne
petitioner's will to confess, violating petitioner's Due Process rights
of the 5th, 6th and 14th Amendment of the U.S. constitution.

Petitioner felt intimidated and threatened if he didn't give officer
Brocchini "what he wanted to hear."

I was informed by officer Brocchini prior to the interview, that I was not
being charged with anything, and indicated that a cooperative attitude would
be to my benefit.

He went on to state that; although I've denied any involvement, it would
be in my best interest just to "simply" say: "That; yes, I was with them,
but didn't know what they were going to do, or, that we was going to see
some girl's or something"!

Officer Brocchini lead petitioner to believe, that if he say something that
could be interpreted as cooperating, he would let petitioner go home.
Despite petitioner's denial of involvement, officer's continued to accuse
me of involvement, and went so far as to state, that they can prove I was
there...a close look at the interview reveal the coercive tactics, and promi
ses made to induce petitioner's confession:

**Brocchini:** Look, Sal. I don't know what part you played
in this, but its already past the point where you were there or you weren't
there. You were there.
Now you-wait a minute, don't say no--wait a minute. Don't--let me finish,
alright? We're past that point. You were in the car when it pulled into
the parking lot with Tweeker and Cano when he was shot. I've already talked

to soda, I've already talked to Tweeker---Yes.

        **Soeun:**  No.

        **Brocchini:**  We've talked to Mop.

        **Soeun:**  I don't know what he said but...

        **Brocchini:**  I do know what they said, and...

        **Soeun:**  I know but never said but---it was the truth; I wasn't there. it's on my life. I wasn't there. looks shorty I wouldn't lie to me.

        **Brocchini:**  Here's---I'm giving you the opportunity right now to tell me you didin't know what was going on. You were goin for a ride to a party and something happened over here.
That's what I'm giving you that opportunity to tell me. If you tell me you weren't there, and I can prove it through three other people you were there that makes it look like you were the kingpin, you were the man.
You were the one calling the shots.
Alright because you're the only one so far that isn't tellin me the truth.
That--I'm being straight up with you right now.

        **Soeun:**  I tell you the truth, I told you the truth. I wasn'

there.        **Brocchini:**  Look it. If your feet prints are there, you're there.

        **Soeun:**  What do you mean my feet prints?

        **Brocchini:**  If your foot prints are there, you're there.-

        **Soeun:**  (Overlaps)----In the car?

        **Brocchini:**  No, not in the car, at the house.

        **Soeun:**  What house? What house?
        **Brocchini:**  Okay, tell me what you know about this?

        **Soeun:**  No.    **(See EXHIBIT 1, Pg. 5-6)**

Officer Brocchini continued to accuse petitioner of participating in the

alleged crime, despite petitioner's claim that he didn't know nothing about

it.

Although petitioner made it clear that he wouldn't tell him about the inci-

dent by stating ""NO", to Brocchini's questions of "tell me what you know

about this." Petitioner was forced by fear of being charged as some ring
leader, if I didn't tell officer Brocchini what he wanted to hear. This
was after 4 long hours of intensive questioning, and having other problems
being emotionally unstabled. This didn't help petitioner's state of mind,
therefore, it was easy to be taken advantage of under these circumstances,
being confused, frustrated, and mixed up.

In **Miranda V. Arizona**, 384 U.S., at 444-45, 86 S.Ct. at 1612, the
court has also recognized that police interrogation can be "so interently
coercive that its very existence is irreconcilable with the possession of
menal freedom by a lone suspect against whom its full coercive force is
brought to bear." **Asheraft V. Tennessee**, 322 U.S. 143, 154, 64 S.Ct. 921,
926, 88 L.Ed. 1192 (1944). Accordingly, where conditions of interrogation
are so coercive that they rob suspects of their free will, Courts will sup-
press defendant's statements notwithstanding the fact that these statements
came on the heels of properly administered Miranda warnings. See, e.g.,
**Martucci V. Johnson**, 944 F.2d 291 (6th Cir.1991); **United States V. Anderson**,
929 F.2d 96 (2nd Cir.1991).

In this case, petitioner had no prior experience in the criminal
justice system, to with stand police improper interrogation tactics for
the sole purpose of eliciting incriminating statements.
Petitioner speaks fluent  Cambodian and has trouble understanding the engli-
sh construction of expression, and it is further complicating due to petit-
ioner dropping out of school in the 8th grade.  (See, EXHIBIT 3.)
Between both interviews petitioner strongly stated to officer Brocchini
that "I wasn't there" or "I don't know," on 32 different occasions.
The interrogating officers never honored that petitioner stated he wasn't
involved and didn't know what took place. All that they were conerned with,
was coercing petitioner into making a statement that officers could use

to bring charges against himself.

During these interviews, petitioner stated that "I wasn't there" 11 times, and "I don't know" 21 times. But despite petitioner's denial of any involve- ment, officers continued to use trickery and pressure tactics designed to ware petitioner down through fatigue, and mental depression. (See EXHIBIT, Pg. 4,5,6,7,8,9,13,17,18,21,23,25,27,30,32.)

   An example of officer Brocchini's pressure tactics is during his first interview, when he attempts to use fear tactics to elicit incriminat- ing statements:

> BROCCHINI:  (Overlaps) No, not when you went to the hospital.
> He says when he drove it into the parking lot
> when Cano was bleedin, you were in the car. Alrig-
> ht, so now we're past that. Don't don't even play
> in that lie.
>
> SOEUN:  Shorty, no.
>
> BROCCHINI:  No Sal, c'mon. Sal, don't even go there. You
> know I'm gonna get the truth, I've already got
> the truth. I'm givin you—tell me what happened,
> tell me what happened.
>
> SOEUN:  I don't know. truth.
>
> BROCCHINI:  Now whoa, listen, no Sal, you were there, weren't
> you?
>
> SOEUN:  Umm
>
> BROCCHINI:  No.
>
> SOEUN:  What are you tryin to force of me?
>
> BROCCHINI:  I'm not tryin to force it on you, I'm just tryin'
> to force the truth out of you.

> SOEUN:      I tell the truth. Man shorty  come shorty, they
>             were lie you with that. (SEE EXHIBIT 1, Pg.7-
>             8)

Officer Brocchini continues to make subtle threats toward petitioner, forc-

ing him into telling the officers what they wanted to hear, in order to

be sent home thereafter. The interview becomes intense and more threatening

by officer Brocchini:

> BROCCHINI:  Well, here's all my life. Everybody else--here's
>             all my life. And my word is probably better than yours. You'
>             already been identified. You're there. The end. Now tell
>             me what happened over there.
>
> SOEUN:      I don't know.
>
> BROCCHINI:  Sal. Sal.
>
> SOEUN:      (Overlaps) I told you, why you trying to force
>             it out of me, I don't know.
>
> BROCCHINI:  I'm not forcing it out of you, I'm just tryin
>             to help you get to the truth. If I shut this
>             thing off right here and I lock you into this
>             story that you weren't there, and when we go
>             to Court later and everybody say's oh yeah, he
>             was there, what's it gonna look like? You're
>             the only one that's tellin a lie.
>
> SOEUN:      (Overlaps) See--wait--nobody gonna go to court.
>
> BROCCHINI:  We're gonna.
>
> BROCCHINI:  Hey, Sal. I'm not lyin' to ya.
>
> SOEUN:      Hunh? I'm not lyin' either. I'm not lyin' either.
>             ..
>
> BROCCHINI:  Oh, look Sal. I've already got you there. I've
>             got you there...

SOEUN:        I hear you talkin but...

BROCCHINI:    You're there. And I'm gonna tell you right now,
              You're there, you're gonna have to pay the conse
              quences for being there.

SOEUN:        (Overlaps) Naw, I anit payin no consequences,
              I----...

BROCCHINI:    (Overlaps) Yeah you are. You are gonna pay the
              consequences of being there.

SOEUN:        (Overlaps) Mmm MALE:, Mmmmmmmm (negative). I
              know nothin' about that. I have no idea.

BROCCHINI:    (Overlaps) Sal, I don't wanna see you go down
              with this. I really don't.

SOEUN:        (Overlaps) why you trying to put me?

BROCCHINI:    I'm not. I'm trin' to give you the opportunity
              to tell me hey the house was vacant. or, hyper
              was goin' over there because it was next door
              to Tweeker's or we were gonna go see some ladies.
              I didn't know what was gonna happen. I'm giving
              you every opportunity right now to tell me why
              you were there. But when you say I wasn't there
              and I can prove you were there, well that means
              you were in it deep. You knew exactly what was
              going on and ya planned it...

SOEUN:        Planned it...What...

BROCCHINI:    That's what I'm tellin' you right now...

SOEUN:        C'mon shorty now your trying to say I did it.

BROCCHINI:    I'm...

SOEUN:        See

BROCCHINI:    I'm not tring to say that you did it. I'm saying
              you did. I'm saying you did. (See EXHIBIT 1,
              Pg. 9-11)

**C. Petitioner's Miranda rights were violated during the second interview, where he had not waived his right to remain silent, and thereafter confessed.**

The determination whether an accused has knowingly and voluntarily waived his Miranda rights depends on all the facts of each particular case. **Fare V. Michael**,C., 442 U.S. 707, 724-25, 99 S.Ct. 2560, 2571-72, 61 L.Ed.2 197 (1979).

These circumstances include the background, experience, and conduct of the accused. **Johnson V. Zerbst**, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed 2d 1461 (1938). Here, petitioner asserts that he had not voluntarily and knowingly waived his rights during the second interview because he was not given fresh Miranda warnings before the interview.

Two considerations aruably support this conclusion: First, the second inter view came nearly two-and-a-half hours after the first interview and nearly 4 hours after Miranda rights had been given; second, petitioner's confess- ion came after the second interview "only" as a result of intense and pro- loged interrogation without any warnings at all.

On <u>Direct Examination</u> by Defense Counsel, petitioner's testimony clearly show's the coercive nature by which officer Brocchini obtained a confession.

Testifying in his own defense, Counsel asked petitioner a series of quest- ions relating to both interview's, and here is what was said:

      **MR. MEEK: Q.** Were you asked any questions as to whether or not you were in fact involved in the incident that happened at 2005 River Pine Court that night? By Detective Brocchini?

      **Defendant: A.** Yeah, did he ask me about was I involved?

            **Q.** Yes.

            **A.** Yes, he asked me about it.

            **Q.** And what was your response?

A.  Don't know.

Q.  Your response was you didn't--Your response was,
    "I don't know"?

A.  Yes.

Q.  What do you mean by that? "I don't know"?

A.  I wasn't there. I don't know what happened.

Q.  Okay. Now, you had a second conversation with
    him and it began around 6:30, 7:00 in the morn-
    ing. Correct.

A.  Yes.

Q. Okay. First of all, prior to your first conversa-
   tion at 4:30, had you gotten any sleep that morn-
   ing?

A.  No.

Q.  Had you been given a cup of coffee?

A.  No.

Q.  During your second conversation, referring to
    the one that begun around 6:30, 7:00 in the
    morning, did you change your story as to what
you had stated to Detective Brocchini previously?

A.  Yes.

Q.  And why did you do that?

A.  Because he asked me the same question and I told
    him that, "I don't know."

Q.  And then at some point did you tell the detective
    that you were at the--at 2005 River Pine Court
    that particular morning, that night, the previous
    night?

A.    Yes. I told him I was there but I overheard the
      conversation. Like I heard one of the officer was
      screaming at the--some other, other of my friends
      at the door, saying that, "where's this at" and-
      -some--and they was talking about the--what happen
      ing in this case.

Q.    And did you tell him--so, I'm sorry, did you tell
      Detective Brocchini that you were there, yes or
      no?

A.    Yes.

Q.    And why did you tell him that if you were not there

A.    Cause he keep asking me the same question, like
      he said that, "I know you were there, just tell
      me what part you played," something like that,
      and I told him that, "I don't know."

Q.    Okay. Also, referring you to--well, for the record,
      I'm referring to page eight of twenty-six in the
      second interview. There was a question by Detective
      Brocchini, this is about midway down the page,
      says:
              "Brocchini: Okay. So you're saying it
      was just the three."
      And then your response was:
              "All I want to do is go home now. I don't
      even want to be involved in this."
      Do you recall making that statement?

A.    Yeah.

Q.    What did you mean by that, "I want to go home now,
      I don't even want to be involved in this," what
      did you mean by that?

A.    Don't want to be involved in it. He keep asking
      me, saying that he know I was there and I told

him, "I don't know."

And he trying to pressure me to say that, to tell him
that to say that I was there. I just told him, "I don't
know."

Q.  Did you think by giving the detective some responses
he would let you go home or something?

A.  Guess so, 'cause--Yes.    (SEE EXHIBIT 2, Pg. 521-523)


Under <u>Cross-Examination</u> by the prosecution, petitioner testified
that officer Brocchini coerced him into making incriminating statements,
through intense and prolonged questioning, that induced petitioner into
telling officer Brocchini what he wanted to hear, in order to go home. The
testimony by petitioner under Cross-Examination is as follow:

Prosecution:  Q.  What kind of deal did you want?

A.  I don't know. go home.
Q.  Right after you asked Detective Brocchini on page three
of the second transcript:

"Can you make a deal with me."

Then you told him:

"All I know that, that they told me they was
gonna go do something. Go to some--somebody's house.
You know, I just went with them, I didn't do nothing."

And then they asked you:

"Who is 'we' ?""

And you say:

"Me, Soda, Cano, that's all."

Do you remember that, that statement in the tape?

A.  I don't remember.

Q.  Were you making that up or is that the truth, that you,
Soda, and Cano went to go do a house?

A. Because I was making it up then, I was making it up.

Q. You made that up?

A. Yeah.

Q. What about that part of the tape where you said that you got out of the car, you went to the house to look to check it out to see if it was clear. And then you came back and you told the guys in the house it was, in the car--I'm sorry, that it was clear. You made that up too?

A. Yeah.

Q. What about the part of the tape where you say Cano got shot, and you were there and you saw that, did you make that up?

A. Yeah. Made everything up.

Q. When Cano called and said he'd planned a burglary, you made that up too?

A. Yes.

Q. When you told the Detective that Soda, Sopheap Chho-eung, got out of the car and dumped the guns at 620 Paradise--

A. Yes.

Q. --You made that up too?

A. Yes.

Q. When you used the words, and I'm quoting now, "I got caught up in it," Unquote, What were you talking About?

A. That I was under arrest.

Q. You weren't saying that you were mixed up in this crime somehow?

A.   No. I was saying that I was under arrest, he arrest
     ed me at the hospital.

Q.   Why would you tell the police that you went to some
     one's house with people who intended to do a burgla
     ry, that they brought guns and were there at
     the time of the crime, if you thought it set you
     free?

A.   I over heard it, I heard some other officer talk
     to somebody next-door, screaming at him, talking
     about "where's the gun at," told him about the crim
     I--

Q.   Why did you admit to being present in this crime
     and participating in it?

A.   Why'd I admit to it?

Q.   Yeah.

A.   He keep on asking me the same question, I told him,
     "I don't know."     (SEE EXHIBIT 2, Pg. 547-550)

Under ReDirect Examination, petitioner conclude's by stating:

By MR. MEEKS: Q.   Mr. Soeun, was it your understanding that if you
                   cooperated with the police during that second con-
                   versation that somehow you would go home that night?

A.   Uh-huh. Yes.

Q.   So it's your testimony that you tried to give the
     police officers what you thought they wanted to
     hear in order so you can go home, is that correct?

A.   Yes.

Q.   And prior to that you say you overheard conversa-
     tions that were taking place that night in other
     rooms, correct?

A.   Yes.

Q.   Sal, were you in fact there at 2005 River Pine Cour
on that particular evening, yes or no?

A.   No.    **(SEE EXHIBIT 2, Pg. 553)**

Petitioner assert's that a coerced confession such as that given

by petitioner to officer Brocchini, the risk that the confession is unrelia

ble, coupled with the profound impact that the confession has upon the

jury, requires a reviewing court to exercise extreme caution before determi

ating that the admission of the confession at trial was harmless...However

absent of the admission of petitioner's statement, he would not have been

found guilty, for there was no evidence linking petitioner to the crime.

Consequently, admission of coerced confessions may distort the truth-seeking

function of the trial upon which the majority focuses.

More importantly, however, the use of coerced confessions, "whether true

or false," is forbidden "because the methods used to extract them offend

an underlying principle in the enforcement of our criminal law: that ours

is an accusatorial and not an inquisitorial system-a system in which the

state must establish guilt by evidence independently and freely secured

and may not by coercion prove its charge against an accused out of his own

mouth," **Rogers V. Richmond**, 365 U.S., at 540-541, 81 S.Ct., at 739-740;

See also **Lego**, 404 U.S., at 485, 92 S.Ct., at 624. This reflects the "stro-

ngly felt attitude of our society that important human values are sacrific-

ed where an agency of the government, in the course of securing a convict-

ion, wrings a confession out of an accused against his will," **Blackburn**

**V. Alabama**, 361 U.S., at 206-207, 80 S.Ct., at 279-280, as well as "the

deep-rooted feeling that the police must obey the law while enforcing the

law; that in the end life and liberty can be as much endangered from illegal

methods used to convict those thought to be criminals as from the actual

criminals themselves," **Spano**, supra, 360 U.S., at 320-321, 79 S.Ct., at 1205-1206.

Thus, permitting a coerced confession to be part of the evidence on which a jury is free to base its verdict of guilty is inconsistent with the thesis that ours is not an inquisitorial system of criminal justice. CF. **Chambers V. Florida**, 309 U.S., at 235-238, 60 S.Ct., at 476-478.

Petitioner ask's this Court to reverse the judgment, vacate the sentence, and remand back to the trial Court with instructions for a new trial absent of the admission of petitioner's coerced confession.

## CONCLUSION

For the foregoing reason, this court should determine that trial Counsel rendered ineffective assistance, for failing to file a pre-trial "Motiom to suppress" the alleged confession, and that the alleged confession used to convict petitioner was a violation of his 5th, 6th, and 14th Amendment of the U.S. Constitution.

In addition, this Court should oder an "evidentary hearing" to address the ineffective assistance claim, and provide petitioner with Counsel to represent him during the evidentary proceedings.

## PRAYER FOR RELIEF

**WHEREFORE,** petitioner respectfully requests that this Court:

1. Take judicial notice of the records and files in **Stanislaus County Superior Court No. 188396**

2. Order respondents to show cause why petitioner is not entitled to the relief sought;

3. After full consideration of the issue's raised in this petition, grant the petition, and vacate the judgment and sentence that was imposed in Stanislaus County Superior Court No. 188396;

4. Appoint petitioner counsel to assist in the litigation necessary to remedy the subject of this petition;

5. That the Court grant other and further relief that is just and proper in the interest of justice.

Dated ,/2/30/07            Respectfully submitted,

                                          Sad Soeun,
                                            Petitioner

**VERIFICATION**

I, the undersigned say:

    1. I am the petitioner in the above cause of action.

    2. The above document is true and correct of my own knowledge, except as to matters that may be stated in it on my own information and belief and, as to those matters, I believe it to be true.

    3. I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this   day of  12/30/07     at Crescent City, California.

Dated:  12/30/07

                    Respectfully Submitted,

                    Sal Soeun,

                    In Propria Persona

# APPENDIX FILE

(B)

(34)

Filed 5/29/03  P. v. Soeun CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| |
|---|
| THE PEOPLE,  Plaintiff and Respondent,    v. SAL SOEUN,  Defendant and |

Appellant.                                        F040952  (Super. Ct. No.

188396)  **OPINION**
        1st

### THE COURT*

APPEAL from a judgment of the Superior Court of Stanislaus County.  A. Girolami, Judge.

Jeffrey S. Kross, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, Robert P. Whitlock and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Sal Soeun was found guilty of six felonies after a jury trial.  The jury found true enhancements alleged as to each count.  In case No. F034265 (Soeun I), we affirmed Soeun's convictions but noted certain errors in sentencing. We remanded the case for resentencing.

The trial court imposed the upper term of 4 years 6 months for attempted robbery (Pen. Code, §§ 664, 211) in count two.  The court imposed a 20-year

Pg.(34)

prison term on count two for a gun use enhancement (§ 12022.53, subd. (c)).  The court imposed a consecutive one-year term on count four for assault with a deadly weapon likely to cause great bodily injury (§ 245, subd. (a)(2)) and a consecutive term of one year eight months on count five for discharge of a firearm (§ 246).  Soeun's total prison term is 27 years 2 months.  The court imposed a restitution fine and granted Soeun 542 days of actual custody credits and 81 days of conduct credits for total custody credits of 623 days.

Most of the court's orders staying and striking enhancements are not relevant to this appeal except as follows.  The court struck two gun enhancements on count one (§ 12022.53, subd. (b), § 12022, subd. (a)), but stayed another gun enhancement (§ 12022.53, subd. (c)).  On count four, the court stayed a gun enhancement (§ 12022, subd. (a)).

Soeun has filed the instant appeal alleging three errors during resentencing:  (1) the trial court erred in staying rather than striking the sentence on the gun use enhancement (§ 12022.53, subd. (c)) in count one; (2) the trial court erred in staying the arming enhancement (§ 12022, subd. (a)(1)) in count four; (3) the trial court miscalculated Soeun's presentence custody credits.  The respondent concedes all three errors.

### SECTION 12022.53 ENHANCEMENT - COUNT ONE

Soeun contends the trial court improperly stayed, rather than striking, a gun use enhancement (§ 12022.53, subd. (c)) in count one.  At resentencing, the trial court struck the section 12022.53, subdivision (b) allegation but only stayed the section 12022.53, subdivision (c) allegation.  In Soeun I we found section 12022.53, subdivision (a) did not list conspiracy as a proscribed offense for which the enhancement applied.  For this reason, we held no section 12022.53 enhancement was appropriate for count one and ordered any such enhancement stricken.  The trial court failed to strike the section 12022.53, subdivision (c)

pg. (35)

allegation.  Accordingly, we will order the court to strike this offense and correct
the abstract of judgment.

## SECTION 12022(a) ENHANCEMENT - COUNT FOUR

The prosecutor specifically requested the trial court strike the section
12022, subdivision (a) arming enhancements in counts one through four.  The
court, however, expressly stated it would impose and stay sentence for this
enhancement as to counts three and four.  In Soeun I, however, we held that
because being armed with a firearm was an essential element of section 245,
subdivision (a)(2), the arming enhancement (§ 12022, subd. (a)) could not be
imposed.  The proper remedy is to strike such an enhancement.  *(People v.
Summersville* (1995) 34 Cal.App.4th 1062, 1069-1070; *People v. McGee* (1993)
15 Cal.App.4th 107, 112-117.)

## CUSTODY CREDITS

The trial court failed to recalculate Soeun's actual custody credits for the
entire time he was incarcerated.  This was error.  (§ 2900.1; *People v. Buckhalter*
(2001) 26 Cal.4th 20, 23, 40-41.)  Accordingly, we will remand for the trial court
to recalculate Soeun's actual custody credits.

## DISPOSITION

The case is remanded with instructions to the trial court to strike the section
12022.53, subdivision (c) enhancement in count one, to strike the section 12022,
subdivision (a) arming enhancement alleged in count four, and to recalculate
Soeun's actual custody credits pursuant to the *Buckhalter* case.  The court shall
prepare a corrected abstract of judgment reflecting these changes and forward it to
the Department of Corrections.  In all other respects, the judgment is affirmed.

pg. (36)

P53393

COURT OF APPEAL
FIFTH APPELLATE DISTRICT
F I L E D

MAR 0 6 2001 DOCKETED

Eve Sproule Court Administrator MAR 0 8 2001
By _____ O'CONNER
By S. JORGENSON
Deputy

# INMATE'S COPY

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

No. SA1555 DA1806

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F034265 |
| Plaintiff and Respondent, | (Super. Ct. No. 188396) |
| v. | |
| SAL SOEUN, | **O P I N I O N** |
| Defendant and Appellant. | 2 nd |

## THE COURT*

APPEAL from a judgment of the Superior Court of Stanislaus County. Al Girolami, Judge.

Jeffrey S. Kross, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Senior Assistant Attorney General, Stephen G. Herndon and Paul O'Connor, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

_____

*Before Harris, Acting P.J., Buckley, J., and Cornell, J.

constitutional guarantee against cruel and unusual punishment; 2) section 12022.53 does not apply to conspiracy; 3) the term imposed on either count IV or V violated section 654's proscription against multiple punishment; and 4) in count IV the court improperly imposed an enhancement pursuant to section 12022, subdivision (a)(1). We will find merit to Soeun's second and fourth contentions and remand the matter to the trial court for resentencing. In all other respects, we will affirm.

## FACTS

The prosecution evidence established that Soeun, Sokhean Keo and Sopheap Chheuong were members of the Cambodian Mafia Family criminal street gang. On March 27, 1998, Soeun , Keo, Chheuoung and another man attempted a home invasion robbery at a residence on River Pine Street in Modesto where Siphan Nong (Nong) and Sovanna Prak lived with their children, including Jackson Siphan (Jackson). Sometime after 8:00 p.m. on that date, there was a loud noise at the residence's front door as if someone had kicked it.[3] Jackson looked out the window but did not see anyone. He looked out the window a second time and this time saw a man kneeling four to five feet away from the window. Prak looked out the window and saw two men. She then yelled for her children to get their father and call the police.

Meanwhile, Keo entered the kitchen through the window carrying a shotgun. Keo pointed the shotgun at Nong, who by then had entered the kitchen armed with a handgun. Keo then pointed the shotgun at the ceiling and fired it. Nong fired his handgun several times striking Keo once. Nevertheless, Keo managed to escape out the window. At about the same time, someone fired two or three shots into the house through the living room window. One shot struck a wall above Nong's head.

---

[3]    A partial shoe print found on the victims' front door was consistent with the pattern on the soles of the shoes Soeun was wearing when he was arrested.

violative if it is grossly disproportionate to the offense for which it is imposed. (*Id.* at p 424.) The court pointed out three techniques for making this determination. The first technique is to examine the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society. (*Id.* at p. 425.) In *People v. Dillon supra*, 34 Cal.4th 410 the court elaborated on this technique and held that the court should examine not only the offense in the abstract but the facts of the crime as well. In *Dillon,* the court considered the totality of the circumstances including motive, the manner in which the crime was committed, the extent of the defendant's involvement, and the consequences of the defendant's acts. (*Id.* at p. 479.) The second technique involves comparing the challenged penalty with the punishments prescribed in the same jurisdiction for different offenses which, by the same test, must be deemed more serious. (*Id.* at p. 426.) The third technique involves a comparison of the challenged penalty with the punishments prescribed for the same offense in other jurisdictions having an identical or similar constitutional provision. (*Id.* at p. 427.)

Further, appellant has the burden of showing that his punishment is cruel and unusual. (*People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196-1197.)

Soeun addresses the first technique by noting that he was only 19 years old when he committed the underlying offenses and that he did not personally use a gun. However, he fails to address several circumstances that support the court's imposition of a 20-year arming enhancement. Use of a firearm during any offense substantially augments the seriousness of an offense because it increases the likelihood that innocent people might be hurt or killed. This is particularly true when the firearm is used to commit one of the serious felonies enumerated under section 12022.53, subdivision (a) such as home invasion robbery and it is especially so when the underlying offense is committed for the benefit of a gang. (See section 186.21 ["The Legislature . . . finds that the State of California is in a state of crisis which has been caused by violent street gangs whose members threaten, terrorize, and commit a multitude of crimes against the peaceful

5

pg. (39)

Soeun's comparison is inapposite because section 12022.53 does not punish the discharge of a firearm alone; it punishes it only when it is done in conjunction with the commission of one of the violent felonies enumerated in that section and it does not punish a defendant vicariously unless the underlying offense is perpetrated for the benefit of a street gang. (§ 12022.53, subd. (e)(1).)

In *People v. Martinez* (1999) 76 Cal.App.4th 489, the court upheld section 12022.53 against a claim that it imposed cruel and unusual punishment. In so doing the court stated,

> "[T]he Legislature determined in enacting section 12022.53 that the use of firearms in commission of the designated felonies is such a danger that, 'substantially longer prison sentences must be imposed . . . in order to protect our citizens and to deter violent crime.' The ease with which a victim of one of the enumerated felonies could be killed or injured if a firearm is involved clearly supports a legislative distinction treating firearm offenses more harshly than the same crimes committed by other means, in order to deter the use of firearms and save lives. [Citations.]" (*Id.* at pp. 497-498.)

In accord with *Martinez*, we find that the comparison made by Soeun does not establish that the punishment provided by section 12022.53 is unconstitutional.

We need not consider the third *Lynch* technique because Soeun has not proffered any argument that section 12022.53 is unconstitutional on that basis. Moreover, although Soeun contends that his 20-year term is cruel and unusual under the Eighth Amendment of the United States Constitution, he advances no argument or authority in support of this contention. In view of this, we need not discuss this contention any further. (*People v. Ham* (1970) 7 Cal.App.3d 783.) Nevertheless, we find that the following quote from *Martinez* is equally applicable here:

> "The judicial inquiry commences with great deference to the Legislature. Fixing the penalty for crimes is the province of the Legislature, which is in the best position to evaluate the gravity of different crimes and to make judgments among different penological approaches. [Citations.] Only in the rarest of cases could a court declare that the length

7

pg. (40)

blast into the ceiling) or the use of a firearm underlying count V (shots into the house), the consecutive term imposed on either count IV or count V violates section 654's prohibition against multiple punishment. We disagree.

Section 654 provides, in pertinent part provides:

> "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ."

"The purpose of section 654 is to prevent multiple punishment for a single act or omission, even though that act or omission violates more than one statute and thus constitutes more than one crime. Although the distinct crimes may be charged in separate counts and may result in multiple verdicts of guilt, the trial court may impose sentence for only one offense . . . ." (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1135 [54 Cal.Rptr.2d 578] [concurrent sentences for two convictions of conspiracy to murder were proper because each conspiracy involved a separate victim; however, separate punishment for offense of carrying a silencer could not stand where the objective of the crime was the successful completion of the conspiracies].) "We must affirm if substantial evidence supports a trial court's express or implied determination that punishment for crimes occurring during a course of conduct does not involve dual use of facts prohibited by section 654. [Citation.]" (*People v. Palmore* (2000) 79 Cal.App.4th 1290, 1297.)

The courts of appeal are divided on the issue of whether section 654 applies to enhancements. Some decisions have held section 654 "is inapplicable to enhancements, because enhancements ' " 'do not define a crime or offense but relate to the penalty to be imposed under certain circumstances.' " ' [Citations.]" (*People v. Boerner* (1981) 120 Cal.App.3d 506, 511; see also *People v. Rodriguez* (1988) 206 Cal.App.3d 517, 519; *People v. Warinner* (1988) 200 Cal.App.3d 1352, 1355; *People v. Parrish* (1985) 170 Cal.App.3d 336, 344; *People v. Stiltner* (1982) 132 Cal.App.3d 216, 229; *People v. Le* (1984) 154 Cal.App.3d 1, 12 at fn. 11.) Other decisions hold section 654 applies to

9

### *The Arming Enhancement Attached*
### *To The Assault With A Firearm Offense*

Section 12022, subdivision (a)(1) provides:

"Except as provided in subdivisions (c) and (d), any person who is armed with a firearm in the commission or attempted commission of a felony shall, upon conviction of that felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of one year, *unless the arming is an element of the offense of which he or she was convicted.* This additional term shall apply to any person who is a principal in the commission or attempted commission of a felony if one or more of the principals is armed with a firearm, whether or not the person is personally armed with a firearm." (Emphasis added.)

Soeun contends that under the plain wording of section 12022, the court erred in imposing an arming enhancement pursuant to this section on his assault with a firearm offense because the fact of being armed is an essential element of that offense. Respondent concedes and we agree. (See also *People v. Hartsell* (1973) 34 Cal.App.3d 8, 12.) Accordingly, we find the court erred when it imposed a section 12022 arming enhancement in count IV.

### DISPOSITION

The judgment of conviction is affirmed.[4] The matter is remanded to the trial court for resentencing consistent with the views expressed herein.

---

[4]    Count VII of the information charged Chhoeung with being a felon in possession of a firearm. Soeun's abstract of judgment erroneously indicates that Soeun was convicted in count VII of being a felon in possession of a firearm and that he was sentenced to a concurrent two-year term for that offense.

11

pg. (42)



pg. (43)

**SUPERIOR COURT, STATE OF CALIFORNIA, COUNTY OF STANISLAUS**

THE PEOPLE OF THE STATE OF CALIFORNIA   VS.   SAL SOEUN

**NATURE OF HEARING:** PETITION FOR WRIT OF HABEAS CORPUS   **NO:** 188396

**JUDGE:** A. GIROLAMI          **Bailiff:** Larry Sweatman    **Date:** 3/22/04
**Clerk:** J. Carvalho         **Reporter:** none           Modesto, California

Appearances: none

    The Court, having received the Defendant's Petition for a Writ of Habeas Corpus on March 10, 2003, and after having reviewed the motion and the file hereby denies it.

    The Court, having presided over the trial was quite familiar with the facts. The Court is satisfied that it was not incompetence of Counsel (both trial and appellate) to fail to raise the issue of the suppression of the Defendant's statements.

    Defendant, besides having to show the motion would have been meritorious, must also show that it would have been successful. (People v Grant (1988) 45 Cal. 3d 829). This requirement was also followed in a case involving an identical issue. (People v Gonzalez (1998) 64 Cal. App. 4th 432).

    In this case, the Court is satisfied that there was no illegal arrest as there was clearly probable cause to arrest. Secondly, the delay from the arrest to the statements was not excessive. Thirdly, Defendant was advised of his Miranda rights and clearly waived them. Fourthly, there was no undue pressure or coercion prior to the incriminating statement. Lastly, there was prima facie proof of every element of the crime prior to the introduction of the statements.

Copy sent to:

Sal Soen  CDC#P-53393
P.O. Box 7500
Crescent City, California 95531







pg. (44)

IN THE

# Court of Appeal of the State of California

**IN AND FOR THE**

## Fifth Appellate District

COURT OF APPEAL
FIFTH APPELLATE DISTRICT
FILED

JUN 2 3 2005

KAY FRAUENHOLTZ
CLERK/ADMINISTRATOR

By_____
                        Deputy

| | |
|---|---|
| In re<br><br>  SAL SOEUN,<br><br>    On Habeas Corpus. | F045805 |

BY THE COURT*:

  The "Petition For Writ Of Habeas Corpus," filed in this court on June 29, 2004, is denied without prejudice. Petitioner has failed to provide a copy of the second interview or explain why he should be excused from providing such a copy. Petitioner has failed to show that he exhausted his remedy on habeas corpus in the superior court by filing a petition containing the transcripts of both interviews.

_____ Acting P.J.

*Before Harris, Acting P.J., Buckley, J., and Cornell, J.

Pg. (44)



pg. (45)

**SUPERIOR COURT, STATE OF CALIFORNIA, COUNTY OF STANISLAUS**

**THE PEOPLE OF THE STATE OF CALIFORNIA   VS.    SAL SOEUN**
          Plaintiff                                                    Defendant

**NATURE OF HEARING PETITION FOR WRIT OF HABEAS CORPUS No: 188396**

**JUDGE: SCOTT T. STEFFEN**        Bailiff: M. OTTOBONI       Date: 8-23-05
Clerk: M. MARTINEZ              Reporter: NONE            Modesto, California

---

The Court, having received Defendant's Petition for Writ of
Habeas Corpus on July 26, 2005, and having reviewed the Petition
and the accompanying papers, hereby denies the Petition for the
reasons set forth below.

Grounds I and II.  Ineffectiveness of Counsel -  failure to
challenge admissibility of confession - Miranda violation and
undue coercion and/or pressure.

The Court notes that Defendant previously sought relief on this
ground on the same basis as asserted here.  Judge Girolami, who
presided at the trial, ruled, in pertinent part, as follows:

In this case, the Court is satisfied that there was no illegal
arrest as there was clearly probable cause to arrest.  Secondly,
the delay from the arrest to the statements was not excessive.
Thirdly, Defendant was advised of his Miranda rights and clearly
waived them.  Fourthly, there was no undue pressure or coercion
prior to the incriminating statement.  Lastly, there was prima
facie proof of every element of the crime prior to the
introduction of the statements.

(Minute Order, dated March 22, 2004.)

The Court believes that Judge Girolami's order was appropriate.
The Court finds that Defendant was appropriately advised of his
Miranda rights, and clearly waived them at the time Defendant was
first interrogated (March 28, 1998, 4:32 - 5:02 a.m.).  Though
Defendant was apparently not again advised of his Miranda rights
at the commencement of, or during, the second interrogation
(which commenced at 6:37 a.m. on the same day), the second
interrogation was sufficiently contemporaneous that a new
advisement was not necessary.  (People v. Johnson (1969) 70
Cal.2d 469.)  Further, Defendant never asserted his right to
remain silent, or otherwise sought to assert his Miranda rights.
 The Court further finds that no undue coercion or pressure was
exerted upon Defendant at any time during either the first or
second interrogation.  Thus, the confession was not improperly
obtained; it was properly admitted into evidence; counsel's

pg. (45)

failure to rai.   .he issue of suppression o.   .e confession under
the circumstances of this case did not render counsel
ineffective.

Grounds III and IV – the trial court's failure to strike, rather
than stay, enhancements.

        Defendant asserts that the trial court improperly "stayed"
enhancements under Penal Code section 12022.53 (c) and
12022(a)(1).  The Court of Appeal previously ruled that such
enhancements were improperly stayed, and remanded the matter to
this court for corrections to the abstract of judgment.  This
court has so amended its abstract.  (See, Amended Abstract of
Judgment, dated August 12, 2003.)  As that Amended Abstract of
Judgment is consistent with the Court of Appeal's Opinion,
Defendant's arguments are moot.


        Ground V – Trial Court failed to properly calculate Defendant's
pre-sentence credits.

Defendant's pre-sentence credits were incorrectly calculated in
his original sentence.  It appears that on remittitur from the
Court of Appeal's decision rendered on May 29, 2003, the  court
has recalculated such credits, and has now appropriately applied
those credits to Defendant's sentence.  (See Minute Order, dated
August 12, 2003.)

        Ground VI – Double Jeopardy

        Defendant argues that he was subjected to double jeopardy
because he was sentenced on both Count I (conspiracy to commit
home invasion robbery) and Count II.(home invasion robbery).   A
review of the minute order resentencing the Defendant following
his appeal, however, clearly demonstrates that the sentence as to
Count I (conspiracy) was stayed pursuant to Penal Code section
654, and that Defendant's sentence does not include time for the
conviction on that Count.  Accordingly, Defendant's argument is
without merit.

        Ground VII – firearm enhancement

        Defendant was charged in Count VII with an "arming"
enhancement.  He successfully argued on appeal that the arming
enhancement should have been dismissed, as being armed was an
element of the offense of assault with a firearm.  He now argues
that because the arming enhancement was dismissed, "then Count 4
and 5 should also be dropped because they co-inside [sic] with
being in possesion [sic] of a firearm."  Defendant then goes on
to argue that the "court prove [sic] that I was not in possesion
[sic] of any type of weapon."

        Defendant also argues that because the "arming enhancement"
under Penal Code section 12021 was stricken, so to must be his
conviction on Count IV (violation of Penal Code section
245(a)(1), assault with a deadly weapon), and Count V(violation

                        pg.(46)

of Penal Code  ion 246, discharging a fi m at an inhabited
dwelling).

     The Court of Appeal has already reviewed this issue with
regard to Count V , and concluded that the trial court
permissibly found that Defendant had played an active role in a
home invasion robbery in which a firearm was discharged into an
inhabited dwelling.  Contrary to Defendant's position, the 12021
enhancement was stricken as to Count VII because possession of a
firearm was an essential element of the offense alleged therein
(Penal Code section ???).  However, it does not follow that
because the enhancement was stricken as to Count VII, Defendant
cannot be found guilty of another crime requiring, as an element,
possession of a firearm, as does Count V.  Moreover, it was not
necessary that Defendant personally discharge the firearm.  All
that was necessary was that Defendant aided and abetted the
shooter (Peo. v. Blackburn (1999) 72 Cal.App.4th 1520), a finding
that was affirmed by the Court of Appeal.

     The same is essentially true with regard to Count IV,
assault with a deadly weapon.  All persons concerned in the
commission of a crime are principals in the crime so committed.
(People v. Phan (1993) 14 Cal.App.4th 1453, 1463.)    Thus,
Defendant could be convicted of the violation of section 245 even
though he was not personally armed.

     Accordingly, Defendant's argument on this point is also without
merit.

Copy sent to:

Sal Soeun  CDC#P-53393
Pelican Bay State Prison
P.O. Box 7500
Crescent City, CA  95532

Pg. ( 47 )

Rxe
done JC   8/1/05

## Routing Slip

# PETITION FOR WRIT OF HABEAS CORPUS
(PC sections 1473 – 1508 & CRC 4.550; 4.551; 4.552)

1.  Received in Clerk's Office on:    **07/26/05**   at   **1:50**   a.m./p.m.   by   **K. Fortune**
                                    (date)           (time)                           (clerk)

2.  File Marked on:    **07/26/05**   at   **1:50**   a.m./p.m.   by   **K. Fortune**
                          (date)           (time)                           (clerk)

3.  Is there Proof of Service on Respondent / Real party in interest? Please circle one:
    YES     (NO)     (see PC section 1475)

**All Petitions for Writ of Habeas Corpus will be referred to the Court regardless of proof of service status.**

4.  Petition / Case name:    **Peo. Vs. Soeun**     Case Number(s):   **188396**

5.  Routed by:    **Luz Gutierrez**        **07/27/05**   at   **9:15**    (a.m.)/p.m.
                              (clerk)               (date)         (time)

6.  Delivered To:    *Judge Johnson*

## (PLEASE NOTE: DO NOT REFER TO A DARK COURTROOM)

7.  Petition received by Judge: _Johnson_ on _7/28/05_ at _____ a.m./p.m.
                                          (date)                (time)

8.  Petition referred to Judge: _Steffen_    By Judge: _John_
    on _7/29/05_ at _____ a.m./p.m         **SCOTT T. STEFFEN**
       (date)          (time)
    * For The Following Reasons:

**Note: Petition must be ruled upon within 60 days of the date of filing per CRC 4.551 (a)(3)(A).**

## RULING

Petition Is: _____ **X** _____     **Denied On**     8-23-05
                                              (date)

                             **Granted On** _____
                                            (date)

(State reason(s) in Minute Order per CRC section 4.551 (g))

**Order To Show Cause Issued on**
_____                                    (date)

**Informal Response Requested on**
_____                                    (date)

(See time limits contained in CRC 4.551 (b))

pg. (48)

APPENDIX
"F"

pg.(49)

IN THE

# Court of Appeal of the State of California

### IN AND FOR THE

## Fifth Appellate District

COURT OF APPEAL
FIFTH APPELLATE DISTRICT
FILED

AUG 2 4 2006

LEISA V. BIGGERS, CLERK/ADMINISTRATOR
By_____
Deputy

In re

SAL SOEUN,

On Habeas Corpus.

F048833

BY THE COURT*:

The "Petition For Writ Of Habeas Corpus," filed in this court on September 14, 2005, is denied without prejudice. Petitioner has failed to provide a sufficient factual context. (*People v. Duvall* (1995) 9 Cal.4th 464, 474.)

_____ P.J.

EXHIBIT A-1

*Before Ardaiz, P.J., Harris, J., and Dawson, J.

Pg. (49)

APPENDIX
G

S151515

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re SAL SOEUN on Habeas Corpus

The petition for writ of habeas corpus is denied.

SUPREME COURT
**FILED**

AUG 2 2 2007

Frederick K. Ohlrich Clerk

DEPUTY

GEORGE
_____
Chief Justice

Pg.50

APPENDIX

"H"

Pg. 51

| | |
|---|---|
| BROCCHINI: | Basically, you're the last one. We've already talked to everybody else. So, it is March 28th, it's 4:32 in the morning, this is Detective BROCCHINI, I'm here with Detective BERTALOTTO, we're in the upstairs conference room of the Modesto Police Department and with me in here is — can you spell me your last name? |
| SOEUN: | S-O-E-U-N |
| BROCCHINI: | S-O-E-U-N, and your first name? |
| SOEUN: | S-A-L |
| BROCCHINI: | You got a middle name? |
| SOEUN: | Nah. |
| BROCCHINI: | Okay Sal, listen up. You have the right to remain silent. You understand that? |
| SOEUN: | Uh-hunh (affirmative). |
| BROCCHINI: | Anything you say may be used against you in court, you understand that? |
| SOEUN: | Uh-hunh |
| BROCCHINI: | Is that a yes? |
| SOEUN: | Yes. |
| BROCCHINI: | You have the right to the presence of an attorney before and during any questioning, do you understand that? |
| SOEUN: | Yes. |
| BROCCHINI: | If you can't afford an attorney one will be appointed for you free of charge before any questioning if you want. Understand that? |
| SOEUN: | Yes. |
| BROCCHINI: | Okay. Do you have any problem with ah, talkin' to me today, just giving |

03-28-98      0432 hrs.          kt/cf                    Detective BROCCHINI
P:\8027945z2.ss

DISCOVERY

| | me— I've got a couple questions I need to ask you? No problem? |
|---|---|
| SOEUN: | Hunh-uh (negative) Go ahead. |
| BROCCHINI: | Okay, what's your— first of all, what's your address? |
| SOEUN: | 620 Paradise. |
| BROCCHINI: | And which one do you live in? |
| SOEUN: | R101 |
| BROCCHINI: | And, your phone number. |
| SOEUN: | 526-6071 |
| BROCCHINI: | 526- |
| SOEUN: | 6071. |
| BROCCHINI: | And do you go to school? |
| SOEUN: | In— independent study. |
| BROCCHINI: | What's your birthday? |
| SOEUN: | 3-30-80. |
| BROCCHINI: | How tall are you? |
| SOEUN: | 5-5, 5-4. |
| BROCCHINI: | How much you weigh? |
| SOEUN: | 119. |
| BROCCHINI: | And what do they call you? |
| SOEUN: | Nothin'. |

03-28-98     0432 hrs.            kt/cf                    Detective BROCCHINI
P:\8027945z2.ss

pg.(51)

DISCOVERY

| STATEMENT OF SAL SOEUN | 3 of 32 | 98-27945 |
| --- | --- | --- |

BROCCHINI:    I hear they call you Tweaker. That's what somebody was tellin' me today.

SOEUN:    Oh those other— other guy.

BROCCHINI:    No, some other guys said there's two Tweakers.

BERTALOTTO:    (Overlaps) They spell it different, yeah.

BROCCHINI:    You spell your name different that he spells his name.

SOEUN:    (laughs)

BROCCHINI:    No?

SOEUN:    Nah, ain't call me Tweaker.

BROCCHINI:    Okay. And you're ABC or CMF?

SOEUN:    Used to be CMF.

BROCCHINI:    Used to be, hunh?

SOEUN:    Uh-hunh (affirmative).

BROCCHINI:    Not no more?

SOEUN:    (No response heard)

BROCCHINI:    Okay Sal, you know why I'm here. You know why we're here talkin' to you, don't ya?

SOEUN:    Yeah.

BROCCHINI:    '    How ya feel about talkin' to me?

SOEUN:    Nothin'.

BROCCHINI:    Nothin'? Right now, let me turn that ____ up. Right now, if you — if you had anything to do with this Sal, anything, now is the time for you to tell me.

03-28-98    0432 hrs.    kt/cf    Detective BROCCHINI
P:\8027945z2.ss

P9 · (52)

DISCOVERY

| STATEMENT OF SAL SOEUN | 4 of 32 | 98-27945 |
| --- | --- | --- |

SOEUN:          ___ I didn't have nothin' to do with it.

BROCCHINI:     You know who did it?

SOEUN:          Hunh -uh (negative) I wasn't even there.  I was at Paradise Mop and all those guys. For reals.

BROCCHINI:     You know what I'm even talkin' about?

SOEUN:          Uh-hunh (affirmative).

BROCCHINI:     What am I talkin' about?

SOEUN:          When Cano shot.

BROCCHINI:     You know about how he got shot and all that?

SOEUN:          Hunh-uh.

BROCCHINI:     You have any ideas...

SOEUN:          No.

BROCCHINI:     who might have done this?

SOEUN:          I don't know he say — he said he go to a party and ah, came back and some people came running to us telling that Cano got shot, he got shot. And Mop called me, we ran and looked, then me and Mop took him to hospital.

BROCCHINI:     Tell me why you're not the one-- you weren't there.

SOEUN:          Hunh?

BROCCHINI:     Tell me why you weren't there.  With Cano when he got shot.

SOEUN:          'Cause I wasn't.  I wasn't with him.

BROCCHINI:     Why would somebody say you were?

03-28-98    0432 hrs.         kt/cf                    Detective BROCCHINI
P:\8027945z2.ss

pg. (53)



| STATEMENT OF SAL SOEUN | 5 of 32 | 98-27945 |
|---|---|---|

SOEUN:        Don't say that I was with him.

BROCCHINI:    It's too late.  Why would somebody say you were there?

SOEUN:        I wasn't.

BROCCHINI:    But why would somebody say that?

SOEUN:        I don't know— stupid.  I wasn't ever there.  Know nothin' about that.

BROCCHINI:    Do you think it really happened?

SOEUN:        That I was there?

BROCCHINI:    No, that what Cano did?

SOEUN:        I don't know, 'cause it was on him.

BROCCHINI:    If it's necessary to take a lie detector test, would you take one?

SOEUN:        Yeah.

BROCCHINI:    What would the results be, if the question was you were there?

SOEUN:        That I didn't know _____ if I wasn't don't be

BROCCHINI:    Okay look.  Here, turn around, look at me.  I gotta tell you something.
              I've already interviewed a bunch of people.

SOEUN:        I know.

BROCCHINI:    Look, Sal.  I don't know what part you played in this, but it's already past
              the point where you were there or you weren't there.  You were there.
              Now you— wait a minute, don't say no— wait a minute.  Don't— let me
              finish, alright?  We're past that point.  You were in the car when it pulled
              into the parking lot with Tweeker and Cano when he was shot.  I've
              already talked to Soda, I've already talked to Tweeker--- yes.

SOEUN:        No.

03-28-98    0432 hrs.        kt/cf                    Detective BROCCHINI
P:\8027945z2.ss



DISCOVERY

| STATEMENT OF SAL SOEUN | 6 of 32 | 98-27945 |
| --- | --- | --- |

BROCCHINI:    We've talked to Mop.

SOEUN:    I don't know what he said but...

BROCCHINI:    I do know what they said, and...

SOEUN:    I know but never said but--- it was the truth. I wasn't there. It's on my
life. I wasn't there. Looks Shorty I wouldn't lie to me.

BROCCHINI:    Here's— I'm giving you the opportunity right now to tell me you didn't
know what was going on. You were goin' for a ride to a party and
something happened over here. That's what I'm giving you that
opportunity to tell me. If you tell me you weren't there, and I can prove it
through three other people you were there, that's makes it look like you
were the kingpin, you were the man. You were the one callin' the shots.
Alright because you're the only one so far that isn't tellin' me the truth.
That— I'm being straight up with you right now.

SOEUN:    I tell you the truth, I told you the truth. I wasn't there.

BROCCHINI:    Look it. If your feet prints are there, you're there.

SOEUN:    What do you mean my feet prints?

BROCCHINI:    If your footprints are there, you're there. _____

SOEUN:    (Overlaps) _____ In the car?

BROCCHINI:    No, not in the car, at the house.

SOEUN:    What house? What house?

BROCCHINI:    Okay, tell me what you know about this.

SOEUN:    No.

BROCCHINI:    How could you not know everything but when we talked to Mop and when
we talked to Duke, when we talked to Piseth, when we talked to...

SOEUN:    Come on Shorty

03-28-98    0432 hrs.    kt/cf    Detective BROCCHINI
P:\8027945z2.ss

pg.(55)



| STATEMENT OF SAL SOEUN | 7 of 32 | 98-27945 |
|---|---|---|

BROCCHINI:    they all know something, but you're tellin' me you're the only one out of everybody in this whole room that doesn't know anything. How believable is that Sal?

SOEUN:    I'll tell you the truth shorty. I wasn't there. Look I was at Paradise, I was playin' those Cambodian games— gambling game?

BROCCHINI:    With who?

SOEUN:    With Mop and them everybody. Then I saw and Soda just came outta nowhere, just told him that, you know, Cano got shot.

BROCCHINI:    Okay, well what happened. Tell me about that.

SOEUN:    I don't know.

BROCCHINI:    Well, tell me what happened. Soda drove in the parking lot and said Cano got shot?

SOEUN:    Yeah. And all of a sudden I heard, you know, drive by and he's dead.

BROCCHINI:    Who— who was in the car?

SOEUN:    Um— only him— those two. Soda and Cano. Cano's in backseat laying dead.

BROCCHINI:    No, you're— you're way off. I've already got people in the — Tweeker admits being in the car. Tweeker says he drove it in the car. Soda says he drove it in there. So don't---

SOEUN:    Yeah, Soda did.

BROCCHINI:    Yeah, Soda did. But Soda also says you were in the back seat.

SOEUN:    But that's _____

BROCCHINI:    (Overlaps) No, not when you went to the hospital. He says when he drove it into the parking lot when Cano was bleedin', you were in the car. Alright, so now we're past that. Don't, don't even play in that lie.

03-28-98    0432 hrs.    kt/cf    Detective BROCCHINI
P:\8027945z2.ss

pg(56)

 DISCOVERY

STATEMENT OF SAL SOEUN          8 of 32          98-27945

SOEUN:        Shorty, no.

BROCCHINI:    No Sal, c'mon. Sal, don't even go there. You know I'm gonna get the
              truth, I've already got the truth. I'm givin' you— tell me what happened,
              tell me what happened.

SOEUN:        I don't know. Truth.

BROCCHINI:    Now whoa, listen, no Sal, you were there, weren't you?

SOEUN:        Umm

BROCCHINI:    No.

SOEUN:        What are you tryin' to force out of me?

BROCCHINI:    I'm not tryin' to force it on you, I'm just tryin' to force the truth out of
              you.

SOEUN:        I tell the truth. Man Shorty come on Shorty, they were lie you with that.
S
BROCCHINI:    Why would they lie? Why would they lie? Bert, if Cano got--I already
              asked him...

SOEUN:        Ask him. If I did it...

BROCCHINI:    I could— look. Did I ask him already? Soda's statement on tape.

SOEUN:        Uh-hunh.

BROCCHINI:    Moeun's statement on tape. More of Soda's statement. He gave me a
              whole bunch.

SOEUN:        Uh-hunh.

BROCCHINI:    Those are the people I interviewed. Detective BERTALOTTO over here
              interviewed some. Officer HELTON and Mark MONIZ interviewed
              some. Sal, I'm tellin' you, this is a mistake. Something bad happened.
              Cano? I like Cano. I talk to Cano all the time. He's my friend. I didn't
              want to see him get shot, he screwed up, no doubt about it. Listen, he

03-28-98    0432 hrs.          kt/cf                    Detective BROCCHINI
P:\8027945z2.ss

pg.(51)



STATEMENT OF SAL SOEUN                9 of 32                           98-27945

|  | screwed up, he's gonna have to pay some consequences, all right? |

SOEUN:            Who?

BROCCHINI:        He's gonna heal, Cano is.

SOEUN:            Homie_____

BROCCHINI:        You _____ _____

SOEUN:            _____how you gonna do it, how you _____-

BROCCHINI:        (Overlaps) Now why was--- why would everybody else come clean on this and why would everybody else come clean on this and say and— and you want to lie? Why? Just tell me that, Sal.

SOEUN:            Because that's all my life.

BROCCHINI:        Well, here's all my life. Everybody else — here's all my life. And my word is probably better than yours. You've already been identified. You're there. The end. Now tell me what happened over there.

SOEUN:            I don't know.

BROCCHINI:        Sal. Sal.

SOEUN:            (Overlaps) I told you, why you trying to force it out of me I don't know.

BROCCHINI:        I'm not forcing it out of you, I'm just tryin' to help you get to the truth. If I shut this thing off right here and I lock you into this story that you weren't there, and when we go to court later and everybody says oh yeah, he was there, what's it gonna look like? You're the only one that's tellin' a lie.

SOEUN:            (Overlaps) See— wait— nobody gonna go to court.

BROCCHINI:        We're gonna.

BERTALOTTO:       Give me two minutes.

03-28-98    0432 hrs.          kt/cf                      Detective BROCCHINI
P:\8027945z2.ss

pg. (56)

DISCOVERY

STATEMENT OF SAL SOEUN                10 of 32                98-27945

BROCCHINI:      Okay.

BERTALOTTO:     You okay in here?

BROCCHINI:      Yeah, I'm good.

BERTALOTTO:     Okay. (Door shuts).

BROCCHINI:      Hey, Sal, I'm not lyin' to ya.

SOEUN:          Hunh? I'm not lyin' either. I'm not lyin' either...

BROCCHINI:      Oh, look Sal. I've already got you there. I've got you there...

SOEUN:          I hear all you talkin' but...

BROCCHINI:      You're there. And I'm gonna tell you right now, you're there, you're gonna have to pay the consequences for being there.

SOEUN:          (Overlaps) Naw I ain't payin' no consequences, I _____...

BROCCHINI:      (Overlaps) Yeah you are. You are gonna pay the consequences of being there.

SOEUN:          (Overlaps) Mmm MALE:, Mmm mmm (negative). I know nothin' about that. I have no idea.

BROCCHINI:      (Overlaps) Sal, I don't wanna see you go down with this. I really don't.

SOEUN:          I know...

BROCCHINI:      (Overlaps) I don't want to see you go down...

SOEUN:          (Overlaps) Why you trying to put me?

BROCCHINI:      I'm not. I'm tryin' to give you the opportunity to tell me hey the house was vacant. Or, Hyper was goin' over there because it was next door to Tweeker's or we were gonna go see some ladies. I didn't know what was gonna happen. I'm giving you every opportunity right now to tell me why you were there. But when you say I wasn't there and I can prove you were

03-28-98    0432 hrs.          kt/cf                    Detective BROCCHINI
P:\8027945z2.ss

pg. (59)

 DISCOVERY

STATEMENT OF SAL SOEUN          11 of 32                    98-27945

there, well that means you were in it deep.  You knew exactly what was going on and ya planned it...

SOEUN:          Planned it...what...

BROCCHINI:      That's what I'm tellin' you right now...

SOEUN:          C'mon Shorty now your trying to say I did it.

BROCCHINI:      I'm...

SOUEN:          See

BROCCHINI:      I'm not trying to say that you did it.  I'm saying you did.  I'm saying you did.

SOUEN:          Ahhh

BROCCHINI:      I'm saying you were there.

SOUEN:          Ahhh

BROCCHINI:      I'm not saying you pulled the trigger.  I didn't say that.  We did do a, did they do a little things on your hands?

SOEUN:          Yeah

BROCCHINI:      Alright we'll know if you pulled the trigger.  Alright because if you fired a gun, if you handled a gun, that test will come up and prove it.

SOUEN:          So did it come on mine?

BROCCHINI:      No, it, we don't do it tonight, you gotta send it out to the lab, it takes awhile.  Alright.  Same with your shoes.  We got a bunch of footprints over there in the grass, not in the grass, but in a little path...

SOUEN:          So, all, all a bunch of footprint and you only find mine?

BROCCHINI:      No, I didn't say that.  We found Cano's inside the house on the counter.  That was a done deal...

03-28-98    0432 hrs.          kt/cf                    Detective BROCCHINI
P:\8027945z2.ss

DISCOVERY

pg.(60)

| STATEMENT OF SAL SOEUN | 12 of 32 | 98-27945 |
| --- | --- | --- |

SOUEN:          Where, where you find mine?

BROCCHINI:      That guy that took your shoes?

SOUEN:          Huh huh (affirmative)

BROCCHINI:      He found yours. I haven't even interviewed him yet. He found your footprints, I think he found it in the mud, not in the mud, but in the dirt in the path between where the plants are on the way up to the door. He found your footprint. Okay?

SOUEN:          (Mumbling)

BROCCHINI:      I'm not lying to you Sal. I'm not lyin' to you, alright. Your footprint. And then we got Tweeker and Soda who both say you were in the car.

SOUEN:          I know I was in the car to take him to the hospital.

BROCCHINI:      No, no before that. Both of 'em say before that. That you were in the car when it was parked, I'll show you right here, I'll show you exactly what (papers rustling) where they, Soda says here's Tweeker's house, he says he parked it right here. He stayed in car. You, Cano, Tweeker (door slams), you, Cano, Tweeker...

SOUEN:          He meant the other Tweeker, not me.

BROCCHINI:      No, no, you, no, no you. I'm not even callin' you Tweeker. You, Cano, Tweeker...

BERTALOTTO:     Sopheap

BROCCHINI:      Somebody else too?  Got out, Soda, got out and went over, went over here. This is what he's telling me. So you can't tell me you weren't there. I got three people, and your feet print, alright, so now let's get past that and just tell me the truth. Hey, you screwed up you gonna pay the consequences. It might not be bad, it might be bad, I don't know yet. But you can't lie about it. You can't lie about it with this kind of stuff. Sal, you can't lie about it with this kind of stuff. I'm telling you, tell me what happened, maybe...

03-28-98    0432 hrs.          kt/cf                    Detective BROCCHINI
P:\8027945z2.ss

pg.(61)

DISCOVERY

STATEMENT OF SAL SOEUN         13 of 32         98-27945

| | |
|---|---|
| SOUEN: | I don't know |
| BROCCHINI: | ...you're goin' to visit some girls over there, I don't know. |
| SOUEN: | (Talking over BROCCHINI) _____ I've never been to Tweeker's house. |
| BROCCHINI: | ...you're goin' over here to visit girls, Huh? |
| SOUEN: | I never been to Tweeker house. How should... |
| BROCCHINI: | I didn't say Tweeker's house. Tweeker's over here, I'm talkin' about this... |
| SOUEN: | Yeah that's it, never been to Tweeker's house. |
| BROCCHINI: | I didn't say you went there, I'm zayin' your feet print are over here. |
| SOUEN: | But I didn't went there. |
| BROCCHINI: | Who was wearin' your shoes then? |
| SOUEN: | _____ |
| BROCCHINI: | Who was wearin' your shoes then? |
| SOUEN: | How many shoes were, were made like me? How many... |
| BROCCHINI: | No, no |
| SOUEN: | ...how many were... |
| BROCCHINI: | You know what, your shoes aren't brand new. |
| SOUEN: | Yeah |
| BROCCHINI: | No shoes are the same. Alright, Sal... |
| SOUEN: | C'mon Shorty, man. |
| BROCCHINI: | C'mon Sal, no, c'mon Sal. Why would your fr--, own people, your own |

03-28-98      0432 hrs.        kt/cf            Detective BROCCHINI
P:\8027945z2.ss





| STATEMENT OF SAL SOEUN | 14 of 32 | 98-27945 |
|---|---|---|

|  | home boys, your own CMF guys, lie to me about this?  They all are feeling remorseful.  They're sad for Cano.  They wanted the truth... |
|---|---|
| SOUEN: | _____ said I was one who took him to the hospital... |
| BROCCHINI: | Well then...Yeah, I know you went to the hospital, but they want, they told the truth from here. |

(Pause)

| BERTALOTTO: | I just went to re-confirm. |
|---|---|
| BROCCHINI: | Okay |
| BERTALOTTO: | Make sure that what I... |
| BROCCHINI: | Who did say it? |
| BERTALOTTO: | Well originally uhm Piss. |
| BROCCHINI: | Okay |
| BERTALOTTO: | When they were at uhh, when he was countin' off who went to the hospital... |
| BROCCHINI: | Mmm MALE: (affirmative) |
| BERTALOTTO: | ...and he was countin' off all the names... |
| BROCCHINI: | Yeah |
| BERTALOTTO: | And he said okay, well you know him and Mop got in the car at 620 and I said well what about this and this and this, they must already been in the car.  I went back down and hammered him again and asked him about some games, and he says well... |
| BROCCHINI: | He was playin' games? |
| BERTALOTTO: | Sal was playin' games with him at 620, and I said well you said earlier he was in the car, and he goes I got confused.  He says he was in the car when |

03-28-98    0432 hrs.          kt/cf                    Detective BROCCHINI
P:\8027945z2.ss



 DISCOVERY

| STATEMENT OF SAL SOEUN | 15 of 32 | 98-27945 |
|---|---|---|

they went to the hospital. He said he got confused. Piss put you in the car.

SOUEN:          Me?

BERTALOTTO:     Yeah.

SOUEN:          Man, see, they, they're tryin' to put all, put it all on me.

BERTALOTTO:     They're not tryin' to put it all on you...

BROCCHINI:      Nah, nah, nah

BERTALOTTO:     ...but they were, Piss had put you in the car. Now he made a mistake I think, and I talked to Soda again who was in the car...

BROCCHINI:      Right

BERTALOTTO:     ...write it down and Soda said Sal wasn't in the car.

BROCCHINI:      Wasn't?

BERTALOTTO:     Was not.

SOUEN:          See

BERTALOTTO:     Miss was the big guy that said...

BROCCHINI:      I'm not, I'm not, I'm not look, chill...

BERTALOTTO:     (Speaking over BROCCHINI) I, I, hey, I got, I got his statement right here on tape where Piss said you, Tweeker, Soda and Cano were in the car when it got to 620 Paradise and Cano was shot. You were in the car.

SOUEN:          No when he came, then I went to them.

BERTALOTTO:     Then you went with 'em?

SOUEN:          Yeah

03-28-98    0432 hrs.              kt/cf                    Detective BROCCHINI
P:\8027945z2.ss

Pg. (64)



| STATEMENT OF SAL SOEUN | 16 of 32 | 98-27945 |
| --- | --- | --- |

BERTALOTTO:    So when Mop and Pisith got in the car, you got in the car too?

SOUEN:    Yeah

BERTALOTTO:    Same time?

SOUEN:    Mmm mm (affirmative) so took to hospital.

BERTALOTTO:    When did Duke get in it, when did Duke show up at the hospital?

SOUEN:    When, when Soda go back to take other, uhm, other crew...

BERTALOTTO:    To get uh Cano's girlfriend?

SOUEN:    Mmm mm (affirmative)

BERTALOTTO:    And then Duke got in then?

SOUEN:    Yeah, see...

BERTALOTTO:    So you're sayin' only three people were in the car when it showed up with Cano hurt? Soda...

SOUEN:    Me

BERTALOTTO:    ...Cano and Tweeker?

BROCCHINI:    No, no, no, no when the car pulled in the parking lot when Cano was shot and, and Soda or ran over...

SOUEN:    No, no that part I was in it. That part when they came, Soda and well when first wounded...

BROCCHINI:    Yeah

BERTALOTTO:    Uh huh (affirmative)

SOUEN:    ...I was in the car.

BERTALOTTO:    Right, who was?

03-28-98    0432 hrs.    kt/cf    Detective BROCCHINI
P:\8027945z2.ss





| SOUEN: | _____ |
|---|---|
| BERTALOTTO: | Soda? |
| SOUEN: | Yeah, Soda |
| BERTALOTTO: | Cano |
| SOUEN: | So was Cano and _____ |
| BERTALOTTO: | And Tweeker. |
| BROCCHINI: | And Tweeker. |
| BERTALOTTO: | Tweeker admits bein' in the car, don't be coverin' for him. |
| SOUEN: | _____ |
| BERTALOTTO: | He was there, right? |
| SOUEN: | Didn't see him 'cause his car is tinted. 'Cause I only saw one, two people. |
| BERTALOTTO: | Okay, but Soda got out of the car and ran to tell you guys... |
| SOUEN: | Yeah but |
| BERTALOTTO: | ...they weren't gonna leave Cano in the car by himself, so Tweeker stayed there. |
| SOUEN: | I didn't know though. |
| BERTALOTTO:, | Tweeker was at the car when you got there, right? |
| BROCCHINI: | No, but then Tweeker got out... |
| SOUEN: | No |
| BROCCHINI: | ...you must of seen him get out? |

**STATEMENT OF SAL SOEUN**                **18 of 32**                        **98-27945**

SOUEN:          C'mon Shorty

BROCCHINI:      'Cause you got in.

SOUEN:          Look, the car pulled in and Soda ran out, call me, I ran over there and
                that's all, and they haven't took him yet, after I went in the car and Mop
                came in and took him in _____ first place, see.

BROCCHINI:      Before Cano left, before he was shot, when he was in 620 Paradise, who
                was with him?

SOUEN:          Before he wasn't shot yet?

BROCCHINI:      Yeah, he wasn't shot yet, he was gamblin' or whatever you guys were
                doin' over there.

SOUEN:          He was gamblin' too.

BROCCHINI:      Yeah, okay, who, who, who was there?

SOUEN:          Along with him?

BROCCHINI:      Yeah

SOUEN:          He was with us, playin' gambling.

BROCCHINI:      Okay, well, then what, what happened, where'd he go?

SOUEN:          I don't know.

BROCCHINI:      Well, who went with him?

SOUEN:          I don't know, that's the problem.   Cano first he told me that he go home
                for some money.  You know he told Mop that, he told Mop that He needed
                some money, then he never came back.

BROCCHINI:      He never came back?

SOUEN:          Mmmm (negative)

03-28-98      0432 hrs.              kt/cf                    Detective BROCCHINI
P:\8027945z2.ss

pg. (67)



**STATEMENT OF SAL SOEUN**                    **19 of 32**                    **98-27945**

| | |
|---|---|
| BERTALOTTO: | Did he leave in his car? |
| SOUEN: | Me? |
| BERTALOTTO: | No, Cano. |
| SOUEN: | Yeah |
| BERTALOTTO: | He took his car? |
| SOUEN: | Yeah |
| BERTALOTTO: | Who got in with him? |
| SOUEN: | I don't know. |
| BERTALOTTO: | You saw him take his car... |
| SOUEN: | Who's gonna take his car, nobody didn't take nobody's car psshhh. |
| BROCCHINI: | How about Jesse? |
| SOUEN: | Who's Jesse? |
| BROCCHINI: | A Mexican guy, kinda stocky. |
| SOUEN: | Who's that? |
| BROCCHINI: | I don't know. You don't know him? |
| BERTALOTTO: | Friend of Cano's? |
| SOUEN: | I never knew a Jesse. |
| BROCCHINI: | No, a friend of Tweeker's. |
| SOUEN: | Me? |
| BROCCHINI: | No, he's a friend, not you. So you are Tweeker? |

03-28-98     0432 hrs.              kt/cf                    Detective BROCCHINI
P:\8027945z2.ss

 pg. (67)

DISCOVERY

| STATEMENT OF SAL SOEUN | 20 of 32 | 98-27945 |
|---|---|---|

SOUEN:      'Cause you keep callin' me Tweeker, _____

BROCCHINI:      I'm talkin' about ABZ Tweeker, you're the CMF Tweeker.

BERTALOTTO:      _____

BROCCHINI:      Okay, do you know any Tweeker's friends, Jesse?

SOEUN:      Mmm mm (negative) Why, why you ask uhm Tweeker about that, Jesse?

BROCCHINI:      I'm going to.

SOUEN:      But all know that, that, uhm, when uhm _____ I went in to see Cano, pull his shirt up and stopped his bleedin' and Mop came behind me and Tweeker and Soda's drivin'.

BROCCHINI:      Remember hard, did Tweeker get in the car and go to the hospital when Cano went?

SOUEN:      Yeah

BROCCHINI:      He did?

SOUEN:      Mmm mm (affirmative)

BROCCHINI:      And then who stayed at the hospital?

SOUEN:      Me and Mop.

BROCCHINI:      And then Tweeker and, and Soda came back?

SOUEN:      No...uhm...

BROCCHINI:      Came, went back to pick up the girlfriend?

SOUEN:      Yeah

BERTALOTTO:      Pisith was with 'em too.

BROCCHINI:      Oh, and Pisith came back...

03-28-98    0432 hrs.        kt/cf          Detective BROCCHINI
P:\8027945z2.ss

P), (69)

DISCOVERY

STATEMENT OF SAL SOEUN                21 of 32                98-27945

BERTALOTTO:     When they came back.

BROCCHINI:      ...was with 'em...

SOUEN:          Came back to get the other crew. _____ it's more people.

BROCCHINI:      So when you're driving over there...

SOUEN:          Not me I wasn't driving.

BROCCHINI:      Well you were in the car...

SOUEN:          Yeah

BROCCHINI:      ...and you're holdin' _____ What are they saying?

SOUEN:          Who?

BROCCHINI:      Tweeker, or Cano, or Soda, or...

SOUEN:          All I heard all that, that, Cano say like drive by, drive by, as in who, who
                did this to you? What happened? He say, you know, he say I'm gonna
                die, I'm gonna die.

BROCCHINI:      That's what Cano was saying?

SOUEN:          Mmm mm (affirmative) I don't know what happened all I want to know
                is who did it and what happened. And now you saying that my footprints
                on the, the, the ground...

BROCCHINI:      Well they're checkin' it out, I mean we got footprints that look like yours,
                no way huh?

SOUEN:          Man now I'm in deep, deep trouble...

BROCCHINI:      No, no, no

BERTALOTTO:     What were they talkin' about in the car? What else?

SOUEN:          That's all

03-28-98    0432 hrs.           kt/cf                   Detective BROCCHINI
P:\8027945z2.ss

pg, (70)



| STATEMENT OF SAL SOEUN | 22 of 32 | 98-27945 |
|---|---|---|

BERTALOTTO:    That's a long ride.  What was Sopeap say?

SOUEN:    Sopeap, I don't know he say somethin' about drive by and then Cano say he gonna die, die. That's all I hear and I just told him quiet, be patient, 'cause he's bleeding.

BROCCHINI:    Did you see a, a long gun in the car?

SOUEN:    Mmm (negative)

BROCCHINI:    No guns?

SOUEN:    Nothin' in the car.

BROCCHINI:    No shotguns?

SOUEN:    Nah uh (negative)

BROCCHINI:    No handguns?

SOUEN:    Shotguns, no guns in the car.  No guns.

BROCCHINI:    Hey he got shot, somethin' happened.

SOUEN:    How _____ or not, I just took him 'cause you know I was payin' attention, I was paying attention to you know his wound.  I wouldn't lie Shorty.

BROCCHINI:    You wouldn't lie?

SOUEN:    Mmm mm (negative) that's on my life.

BROCCHINI:  ⸰  You'd lie for CMF buddies, wouldn't you?  C'mon.

SOUEN:    _____ look, look, if I commit a crime, I've paid a consequence with myself, but if I didn't do it, I ain't you know _____

BROCCHINI:    I know, but if you know your buddies committed a crime, you wouldn't tell me would you?

03-28-98    0432 hrs.        kt/cf            Detective BROCCHINI
P:\8027945z2.ss



 DISCOVERY

| STATEMENT OF SAL SOEUN | 23 of 32 | 98-27945 |
|---|---|---|

SOUEN:     I, I, I still would, you know...

BROCCHINI:     Like you're kinda doin' right now?

SOUEN:     C'mon Shorty, man if I wouldn't, wasn't even there, how should I know that my homey did it?  See?

BROCCHINI:     Okay so when the car pulled up, who, who are you with?

SOUEN:     Who with?

BROCCHINI:     When the car, when the car pulled in the parking lot, which parking lot was it?  When he was shot?  When he was wounded?

SOUEN:     Over there by uhm, I think, first one, first _____ I don't know how to explain this.

BROCCHINI:     By the, by the park?

SOUEN:     Yeah the garbage cans...

BROCCHINI:     By the garbage cans?

SOUEN:     Yes, there.

BROCCHINI:     Okay, so he pulled, who, who were you with?

SOUEN:     Mop.

BROCCHINI:     Anybody else?

SOUEN:     _____ look this garbage can that...

BROCCHINI:     don't draw on this

SOUEN:     I draw you _____

BROCCHINI:     No, no I know where you're talking about, you don't have to draw me a picture.  There you go, draw that.

03-28-98     0432 hrs.          kt/cf                    Detective BROCCHINI
P:\8027945z2.ss




STATEMENT OF SAL SOEUN                    24 of 32                    98-27945

| | |
|---|---|
| SOUEN: | Okay, this is the garbage can here, right? |
| BROCCHINI: | Yeah |
| SOUEN: | There's the parking lot |
| BROCCHINI: | Yeah |
| SOUEN: | This is where the, parked his car at right here... |
| BROCCHINI: | Yeah |
| SOUEN: | Then me and Mop ran out this corner, with a, to see Cano and Tweeker, comin' over here... |
| BROCCHINI: | Tweeker? |
| SOUEN: | Mmm mm (affirmative). I know he got from nowhere, there was just Mop took Cano to hospital. |
| BROCCHINI: | Where was Soda at? |
| SOUEN: | The car he's in the car. |
| BROCCHINI: | Okay, so when the car, did you see the car park? |
| SOUEN: | Mmm mm (affirmative) |
| BROCCHINI: | Did you see Soda get out ? |
| SOUEN: | Yeah...we ran over and call us. |
| BROCCHINI: | Okay when Soda, did, okay, you were over here... |
| SOUEN: | Mmm mm (affirmative) |
| BROCCHINI: | Did you see the car park? |
| SOUEN: | Mmm mm (negative) They, Soda ran and called us. |

03-28-98      0432 hrs.          kt/cf                    Detective BROCCHINI
P:\8027945z2.ss





STATEMENT OF SAL SOEUN                    25 of 32                    98-27945

| | |
|---|---|
| BROCCHINI: | That's the first time you saw... |
| SOUEN: | Soda |
| BROCCHINI: | ...the other car, so that means Tweeker coulda ran too over there and you didn't know it... |
| SOUEN: | Yeah, _____ trash can. |
| BROCCHINI: | Or hidin' his gun, huh? |
| SOUEN: | Psshh maybe. |
| BROCCHINI: | You ever see him with a gun? |
| SOUEN: | Nah uh (negative) |
| BROCCHINI: | If you did, would you tell me? If you did would you tell me? |
| SOUEN: | (Mumbling) I don't know, like, I don't know |
| BROCCHINI: | And then when you saw him in there, and you got back in the car, Tweeker got back in too? |
| SOUEN: | Mmm mm (affirmative) then went to hospital, then Soda went with us, uh second route. |
| BROCCHINI: | Uh huh (affirmative) |
| SOUEN: | Pick up his girlfriend |
| BROCCHINI: | (Sighs) Okay |
| SOUEN: | Am I, am I in deep trouble? |
| BROCCHINI: | No, should you be? I don't know if you're in trouble yet. If you're holdin' back and I found out you could be in trouble. |
| SOUEN: | I told you the truth Shorty, what should I lie for? |

03-28-98    0432 hrs.              kt/cf                    Detective BROCCHINI
P:\8027945z2.ss

pg. (74)



| STATEMENT OF SAL SOEUN | 26 of 32 | 98-27945 |
| --- | --- | --- |

BROCCHINI:    Because you already told me that you wouldn't tell on your friends, and you'd make me find the gun myself.

SOUEN:    Man, would do the same thing too Shorty.

BROCCHINI:    No, I'll tell you right now, if he shot somebody, I'd tell.

SOUEN:    'Cause you, you all different, you all work for the police.

BROCCHINI:    Okay, so tell me about it.

SOUEN:    I live in the hood, you know...

BROCCHINI:    Can't do it.

SOUEN:    ....you know got to find out for yourself, I'm acting dumb now.

BROCCHINI:    You're acting dumb now?

SOUEN:    I'm acting dumb

BROCCHINI:    Alright are we done?

BERTALOTTO:    Well let's say that, who you acting dumb about?

SOUEN:    Huh?

BERTALOTTO:    Sopeap, Cano, or Tweeker?

SOUEN:    No I'm talkin' about uhm when he's talkin' about when _____...

BERTALOTTO:    with the gun

SOUEN:    ...had the gun...

BERTALOTTO:    Your friend had a gun?

SOUEN:    Yeah

BERTALOTTO:    And you're acting dumb right now and I'm askin' you who you actin'

03-28-98    0432 hrs.    kt/cf    Detective BROCCHINI
P:\8027945z2.ss

PG.(75)



STATEMENT OF SAL SOEUN                27 of 32                    98-27945

                        dumb for right now, Tweeker?

SOUEN:          No _____ when he was talkin' about _____ gun, so...

BERTALOTTO:     And I'm asking who, who had a gun tonight?

SOUEN:          I don't know, that's the point, that's the problem _____

BERTALOTTO:     And how do I know you're acting dumb or you're telling me the truth?

SOUEN:          You're getting confused.

BERTALOTTO:     No, it's pretty simple.  You already said you'd act dumb for your friends,
                I'm asking you who had a gun tonight...

SOUEN:          It's, it's, it's

BERTALOTTO:     ...and now you're acting dumb, you're sayin' I don't know.

SOUEN:          Look, this is what I mean, I'm gonna show you an example.
                _____ gun right they'd hide it...

BERTALOTTO:     Uh huh

SOUEN:          ...and if, if I see it, I'm like I didn't even see it. Act dumb, I didn't know
                nothin' about it.

BERTALOTTO:     Mmm hmm

BROCCHINI:      Is that what happened tonight?

SOUEN:          I didn't, I didn't really see they just came from nowhere, from behind.

BERTALOTTO:     Who came from nowhere?

SOUEN:          Tweeker

BERTALOTTO:     You don't know if he was in the car or not when they got there?

SOUEN:          Nah uh (negative)

03-28-98     0432 hrs.           kt/cf                    Detective BROCCHINI
P:\8027945z2.ss

pg.(76)


DISCOVERY

STATEMENT OF SAL SOEUN                          28 of 32                          98-27945

BERTALOTTO:    Do you know if anyone else was in the car?

SOUEN:         Nope.  Only me, Mop, Sopeap, Cano and Tweeker, that's that's the first...

BERTALOTTO:    And Pisith

SOUEN:         ...Pisith went to the hospital.

BERTALOTTO:    Pisith was in the car too.

SOEUN:         Who?

BERTALOTTO:    Piss

SOEUN:         Pisith

BROCCHINI:     Pisith or...

BERTALOTTO:    Pisith

SOUEN:         No, that's that's the second route.

BERTALOTTO:    No, he's already told me he was in the car the first time _____
               and he told me you guys stayed at the hospital and he came back to get the
               girlfriend.

SOUEN:         (Speaking over BERTALOTTO) Go, go ask him, go ask him.

BERTALOTTO:    I did.  That's who's on this tape right here.

SOUEN:         He didn't go on the first route.

BERTALOTTO:    Said he did.  Told me everybody who was in the car.

SOUEN:         How can, how can he fit him in the first.

BERTALOTTO:    I didn't know, he had six guys in the car.

SOUEN:         Oh man, he, he, he didn't go, he's lyin' man.

03-28-98    0432 hrs.            kt/cf                    Detective BROCCHINI
P:\8027945z2.ss

pg.(77)


DISCOVERY

BERTALOTTO:    Why would he lie?

SOUEN:    I don't know why he would lie.

BERTALOTTO:    He told me about who went to the hospital, how you and Mop stayed with Cano, who came back, and they picked up Duke and they picked up the girlfriend and they went back and that's when they got the guns pointed at 'em.

SOUEN:    How would, how would Pisith know, Pisith wasn't even there yet.

BERTALOTTO:    Pisith said he was there all afternoon.

SOUEN:    Afternoon. But when that night _____ he wasn't there. He went home and changed, changed clothes.

BERTALOTTO:    He told me he was there when they pulled in and said Cano got shot.

SOUEN:    Nah uh (negative), Nah uh (negative) that's wrong.

BERTALOTTO:    He told me about it.

SOUEN:    Talk to him.

BERTALOTTO:    I did. Maybe I oughta go get him and bring him up here now.

SOUEN:    Yeah bring him up now. Talk to him here

BERTALOTTO:    Why's he lyin'?

SOUEN:    Go ahead talk to him. He said he come out first on second route.

BERTALOTTO:    He said first time.

SOUEN:    Call him.

(Papers rustling)

BERTALOTTO:    Mop and Pisith got in the car and went to the hospital. Mop and Sal stayed at the hospital with Cano, Sopeap, Tweeker, Pisith go back to 620

03-28-98    0432 hrs.        kt/cf                Detective BROCCHINI
P:\8027945z2.ss

|  |  |
|---|---|
|  | and picked up Duke and the girlfriend. That's what Pisith told me. |
| BROCCHINI: | (Clears throat) |
| BERTALOTTO: | They go back to 620. On the first ride to the hospital Mop said, Mop and Pisith got in the car and he said you were already in the car. |
| SOUEN: | I don't know man, He, I don't know, all I got to say that... |
| BERTALOTTO: | I'm not playin' games, I'm just tellin' you what he told me. |
| SOUEN: | I know |
| BERTALOTTO: | Now somebody's lyin' somewhere. |
| SOUEN: | All I got to say that... |
| BERTALOTTO: | That's a simple thing. He has no reason to lie about goin' to the hospital. |
| SOUEN: | When, when Soda came he came _____ us me and Mop and them, you know over there, I went in the car, you know Mop went after me... |
| BERTALOTTO: | Who was in the backseat with you? |
| SOUEN: | Mop. |
| BERTALOTTO: | You, Mop and Cano in the back? |
| SOUEN: | hmm mm (affirmative) yeah |
| BERTALOTTO: | That's all? Who was in the front? |
| SOUEN: | Tweeker and driver is Sopeap |
| BERTALOTTO: | Sopeap. And your saying Pisith wasn't in the car at all |
| SQUEN: | Mmm-hmm (negative). There there was a second route remember um |
| BERTALOTTO: | I'll talk to him again |

pg. (79)

 DISCOVERY

STATEMENT OF SAL SOEUN                 31 of 32                    98-27945

SQUEN:          Ok Ok ---- police always jack me and my buddy and put it in the car

BERTALOTTO:     Mmm-hmm

SQUEN:          And then they came Cano came the second route

BERTALOTTO:     Mmm-hmm

SQUEN:          And the police checking him

BERTALOTTO:     Mmm-hmm

SQUEN:          Yeah thats thats when they when they got him

BERTALOTTO:     You said he was in the car the first time and you stayed with Soda

SQUEN:          Nah-uh

BERTALOTTO:     And ah

SQUEN:          Nah

BERTALOTTO:     And Soda and Tweeker go back to get the girlfriend and that's when Duke
                got in. You told me when Duke even got in the car

SQUEN:          mmm

BERTALOTTO:     Ok Im I ain't gonna waste my time on that

BROCCHINI:      How long you've been CMF?

SQUEN:          About a year. Are you gonna charge me for that

BROCCHINI:      I ain't charging you with anything right now. You want me to charge you
                with it

SQUEN:          No

BROCCHINI:      Ok I think I'm tired. You got anymore questions for now.


03-28-98    0432 hrs.           kt/cf                Detective BROCCHINI
P:\8027945z2.ss





| STATEMENT OF SAL SOEUN | 32 of 32 | 98-27945 |
| --- | --- | --- |

SQUEN:              Shorty, Shorty, am I goinig to be locked up?

BROCCHINI:        I don't think so

SQUEN:              How how about the footprints you

BROCCHINI:        I gotta look on it.  I'm gonna check on it.  If your footprints there

SQUEN:              Then your gonna call me

BROCCHINI:        No I'm gonna come get you

SQUEN:              Get me

BROCCHINI:        yeah.  I don't know I might even I'm not done yet I gotta go talk to
                   Tweeker again one more time.  This is your last opportunity here to be
                   truthful with me

SQUEN:              yeah ------

BROCCHINI:        Did you go to that house

SQUEN:              hmm-mm (no) I — Soda just told --- I know nothing about where they
                   went or --- that

BROCCHINI:        Or what they were gonna to do to ---


SQUEN:              All I seen all I heard is that Cano got shot and he got hit and I went to the
                   car me and Mop and went with Tweeker to the hospital.  That's all, for
                   real.

BROCCHINI:    ,    All right.  It's 5:02.  We're shutting her off.


03-28-98     0432 hrs.              kt/cf                    Detective BROCCHINI
P:\8027945z2.ss





APPENDIX "I"

PG. 82

521

1    any, with this incident that happened, crime, what was your
2    response, I'm referring to the -- for the most part, what was
3    your response in the first conversation?

4        MR. MANER:  Objection, calls for a narrative, it's also
5    overbroad and vague.

6        THE COURT:  Sustained.

7        MR. MEEKS:  Q.  Were you asked any questions as to
8    whether or not you were in fact involved in the incident that
9    happened at 2005 River Pine Court that night?  By Detective
10   Brocchini?

11       A.  Yeah, did he ask me about was I involved?

12       Q.  Yes.

13       A.  Yes, he asked me about it.

14       Q.  And what was your response?

15       A.  Don't know.

16       Q.  Your response was you didn't -- your response was, "I
17   don't know"?

18       A.  Yes.

19       Q.  What do you mean by that?  "I don't know"?

20       A.  I wasn't there.  I don't know what happened.

21       Q.  Okay.  Now, you had a second conversation with him
22   and it began around 6:30, 7:00 in the morning.  Correct?

23       A.  Yes.

24       Q.  Okay.  First of all, prior to your first conversation
25   at 4:30, had you gotten any sleep that morning?

26       A.  No.

27       Q.  Had you been given a cup of coffee?

28       A.  No.

PJ (82)

522

1   Q.  During your second conversation, referring to the one

2   that began around 6:30, 7:00 in the morning, did you change

3   your story as to what you had stated to Detective Brocchini

4   previously?

5   A.  Yes.

6   Q.  And why did you do that?

7   A.  Because he asked me the same question and I told him

8   that, "I don't know."

9   Q.  And then at some point did you tell the detective

10  that you were at the -- at 2005 River Pine Court that

11  particular morning, that night, the previous night?

12  A.  Yes.  I told him I was there but I overheard the

13  conversation.  Like I heard one of the officer was screaming

14  at the -- some other, other of my friends at the door, saying

15  that, "Where's this at" and -- some -- and they was talking

16  about the -- what happening in this case.

17  Q.  And did you tell him -- so, I'm sorry, did you tell

18  Detective Brocchini that you were there, yes or no?

19  A.  Yes.

20  Q.  And why did you tell him that if you were not there?

21  A.  'Cause he keep asking me the same question, like he

22  said that, "I know you were there, just tell me what part you

23  played," something like that, and I told him that, "I don't

24  know."

25  Q.  At some point during your conversation with the

26  detective you asked him to give you a break, what did you mean

27  by that?  Do you remember saying to the detective, asking him

28  to give you a break?

DIANE L. AIELLO, CSR #3206, OFFICIAL REPORTER

PJ.(83)

523

1      A.  Think so.

2      Q.  I'm sorry, you don't remember?

3      A.  Like as in -- (stopping).  Yeah, I think so.

4      Q.  Okay.  Also, referring you to -- well, for the

5  record, I'm referring to page eight of twenty-six in the

6  second interview.  There was a question by Detective

7  Brocchini, this is about midway down the page, says:

8           "Brocchini:  Okay.  So you're saying it

9       was just the three."

10     And then your response was:

11          "All I want to do is go home now.  I don't

12      even want to be involved in this."

13     Do you recall making that statement?

14     A.  Yeah.

15     Q.  What did you mean by that, "I want to go home now, I

16  don't even want to be involved in this," what did you mean by

17  that?

18     A.  Don't want to be involved in it.  He keep asking me,

19  saying that he know I was there and I told him, "I don't

20  know."  And he trying to pressure me to say that, to tell him

21  that to say that I was there.  I just told him, "I don't

22  know."

23     Q.  Did you think by giving the detective some responses

24  he would let you go home or something?

25     A.  Guess so, 'cause -- yes.

26     Q.  At the time you were asked a question as to whether

27  or not you were a member of the gang referred to as CMF, do

28  you remember the detective asking you that question?

pg. (84)

547

1    Q.   Well, you wanted to go home, right?

2    A.   Yes.

3    Q.   And you knew that one way a witness to a crime can go

4    home is if they cut a deal with the police where they testify

5    as a witness instead of being a defendant.   Right?

6    A.   Testify as a witness?

7    Q.   There's one thing you wanted to do with Brocchini,

8    you wanted to cut a deal and be a witness instead of

9    defendant --

10   A.   I didn't say I wanted to be a witness.

11   Q.   Do you remember using the words, "If I tell you the

12   truth you'll -- will you make me a deal?"

13   A.   Yeah.   I think so, yeah.

14   Q.   Okay.   And what did you mean by that?

15   A.   I tell him the truth.

16   Q.   What kind of deal did you want?

17   A.   I don't know.   Go home.

18   Q.   And what was he -- why would he send you home?

19   A.   I don't know.

20   Q.   Right after you asked Detective Brocchini on page

21   three of the second transcript:

22        "Can you make a deal with me."

23   Then you told him:

24        "All I know that, that they told me they

25   was gonna go do something.   Go to some --

26   somebody's house.   You know, I just went with

27   them, I didn't do nothing."

28   And then they asked you:

Pg.(85)

548

1          "Who is 'we'?""

2      And you say:

3          "Me, Soda, Cano, that's all."

4      Do you remember that, that statement in the tape?

5      A.  I don't remember.

6      Q.  Were you making that up or is that the truth, that

7  you, Soda, and Cano went to go do a house?

8      A.  Because I was make it up then, I was making it up.

9      Q.  You made that up?

10     A.  Yeah.

11     Q.  What about that part of the tape where you said that

12 you got out of the car, you went to the house to look to check

13 it out to see if it was clear.  And then you came back and you

14 told the guys in the house it was, in the car -- I'm sorry,

15 that it was clear.  You made that up too?

16 ✓   A.  Yeah.

17     Q.  What about the part of the tape where you say Cano

18 got shot, and you were there and you saw that, did you make

19 that up?

20     A.  Yeah.  Made everything up.

21     Q.  When Cano called and said he'd planned a burglary,

22 you made that up too?

23     A.  Yes.

24     Q.  When you told the detective that Soda, Sopheap

25 Chhoeung, got out of the car and dumped the guns at 620

26 Paradise --

27     A.  Yes.

28     Q.  -- you made that up too?

DIANE L. AIELLO, CSR #3206, OFFICIAL REPORTER

pg.(86)

549

1      A.   Yes.

2      Q.   When you used the words, and I'm quoting now, "I got

3   caught up in it," unquote, what were you talking about?

4      A.   That I was under arrest.

5      Q.   You weren't saying that you were mixed up in this

6   crime somehow?

7      A.   No.  I was saying that I was under arrest, he

8   arrested me at the hospital.

9      Q.   Why would you tell the police that you went to

10  someone's house with people who intended to do a burglary,

11  that they brought guns and you were there at the time of the

12  crime, if you thought it would set you free?

13     A.   I overheard it, I heard some other officer talk to

14  somebody next-door, screaming at him, talking about, "Where's

15  the gun at," told him about the crime.  I --

16     Q.   I'm sorry, go ahead.

17     A.   I just overheard it.

18     Q.   What makes you think that if you tell the police that

19  you were involved in a robbery or where someone got shot that

20  the police would set you free instead of throw you in jail?

21  Isn't that their job, to throw people in jail?

22     A.   Yeah.

23     MR. MEEKS:   Objection, argumentative.

24     THE COURT:   Sustained

25     MR. MANER:   I'll rephrase the question, Judge.

26     Q.   Would you explain to the jury what you were thinking

27  when you told the cops you did this crime.  When really you

28  didn't.  Explain to them how that would cause the police to

550

1   set you free.

2       (Pause)

3       A.   I didn't really catch your question.

4       Q.   Why would you confess to a crime that you didn't do

5   if you were thinking the cops would set you free?

6       MR. MEEKS:  Objection, Your Honor, as to the term

7   "confess."  Objection.

8       THE COURT:  Sustained.

9       MR. MANER:  Q.  Why did you admit to being present in

10  this crime and participating in it?

11      A.   Why'd I admit to it?

12      Q.   Yeah.

13      A.   He keep on asking me the same question, I told him,

14  "I don't know."

15      Q.   I'm asking you the same question again and again and

16  again.  Just like he was, aren't I?

17      MR. MEEKS:  Objection, argumentative.

18      THE COURT:  Sustained.

19      MR. MANER:  Q.  How did you end up in Cano's car that

20  night?

21      A.   Took him to the hospital.

22      Q.   Remember when the car pulled into 620 Paradise?

23      A.   Yeah.

24      Q.   Cano was in the car, right?

25      A.   Guess so, he was shot.

26      Q.   And he came from the house where he got shot, right?

27      A.   I don't know where he came from, I guess so.

28      Q.   You were in the back-seat with him, you should know

DIANE L. AIELLO, CSR #3206, OFFICIAL REPORTER

pg.(88)

553

1    BY MR. MEEKS:  Q.  Mr. Soeun, was it your understanding

2    that if you cooperated with the police during that second

3    conversation that somehow you would go home that night?

4        A.  Uh-huh.  Yes.

5        Q.  So it's your testimony that you tried to give the

6    police officers what you thought they wanted to hear in order

7    so you can go home, is that correct?

8        A.  Yes.

9        Q.  And prior to that you say you overheard conversations

10   that were taking place that night in other rooms, correct?

11       A.  Yes.

12       Q.  Sal, were you in fact there at 2005 River Pine Court

13   on that particular evening, yes or no?

14       A.  No.

15       Q.  And is your testimony you were at home --

16       A.  Not in home, but --

17       Q.  -- at 620 Paradise?

18       A.  Yes.

19   MR. MEEKS:  No further questions.

20

21                    RECROSS-EXAMINATION

22

23   BY MR. MANER:  Q.  Who were you with then?  At 620

24   Paradise when this crime occurred?

25       A.  A couple other friends.

26       Q.  What are their names?

27   MR. MEEKS:  Objection, relevance.

28   THE COURT:  Overruled.

DIANE L. AIELLO, CSR #3206, OFFICIAL REPORTER

Pg. (89)

1   found in the car.  There was no guns seen by anyone running

2   across the -- carrying, the people running across the street.

3         Ladies and gentlemen, submit to you, setting aside your

4   prejudices, no one of us like gangs, the whole idea is

5   uncomfortable.  But just because a person has been associated

6   with a gang as he testified at some point, you cannot set

7   aside your reasoning and make this leap that my client has

8   given to you, when none of the things he said on the witness

9   stand can be supported and substantiated with the evidence.

10        As far as the gang associations, ladies and gentlemen,

11  the only associations my client had was the fact that he

12  happened to live in an area that happens to be known as a gang

13  area where they congregate.  He happened to have friends,

14  testified to one friend in particular that he'd known for

15  years.  He has contacts with these individuals, and therefore

16  he's a gang member, an active gang member.  These contacts are

17  based upon the police officer there every day snooping around,

18  looking at what these people are doing in his neighborhood.

19        Analyze the statement, analyze the statements.  Recall

20  the testimony of the defendant on the witness stand.  Analyze

21  every witness and I submit to you, based on this standard I

22  just read to you:  It is that state of the case which, after

23  the entire comparison and consideration of all the evidence,

24  leaves the minds of the jurors in that condition that they,

25  they cannot say they feel an abiding conviction of the truth

26  of the charge.

27        You have to have an abiding conviction in order to be

28  certain.  And that certainly cannot be based on what was

1   allegedly said in the wee hours of the morning, under pressure

2   by a police officer who allegedly fit together little pieces

3   of the right statement at the right time, that cannot be -- it

4   cannot be based upon that based on the law.  And I submit to

5   you, ladies and gentlemen, as I told you earlier, you cannot

6   convict my client beyond a reasonable doubt of these charges.

7        Thank you.

8

9              REBUTTAL SUMMATION ON BEHALF OF THE PEOPLE

10

11   BY MR. MANER:  Mr. Meeks said to you that nothing the

12   defendant says in his statement is supported by the evidence.

13   Well, he said at one point he used to be CMF, another point he

14   says he's CMF for a year.  The detective gave us at least

15   fifteen different pieces of evidence that are consistent with

16   the defendant belonging to this gang.

17        The defendant said in his statement, "It was me, Soda and

18   Cano, and another Mexican guy who did this crime together."

19   Well, we had the testimony of his own buddies at 620 Paradise

20   who see them all rolling together into the courtyard there

21   after the crime.  There's evidence corroborating the

22   defendant's own statement.

23        The defendant says in his statements on page thirteen and

24   fourteen of the second transcript, he's in the back-seat after

25   Cano is shot, Sopheap was driving, Cano was in the back, he's

26   holding him, that's consistent with the evidence of the

27   defendant's friends Moeung Poth and Pisith Rorn, who see him

28   come into the courtyard.

APPENDIX

"J"

Pg.92

FACTS OF THE OFFENSE:

The following information is taken from investigative reports contained in the district attorney's file:

On March 27, 1998, at approximately 9:00 p.m., officers of the Modesto Police Department were dispatched to 2005 River Pine Court, Modesto, in response to a reported shooting at this address. A witness advised officers when he was driving by the intersection of Pine Tree Lane and River Pine Court that he observed four subjects wearing dark clothing running from the area of 2005 River Pine Court, Modesto, towards a vehicle parked in the area. The witness described the vehicle as a 1989 or 1990 light colored Honda Accord with tinted windows and a rear spoiler. A second witness stated he saw this vehicle and its occupants drive southbound on Pine Tree Lane onto Robertson Road prior to the police officers arrival, and the vehicle was driving without its headlights turned on. After officers secured the residence located at 2005 River Pine Court, they contacted members of the Prak-Nung family which resided there. Sovanna Prak stated that she was inside her residence at approximately 8:55 p.m. when she heard someone kick at the front door of the residence. She described this as a loud kick, not a knock. Sovanna Prak sent one son to get her husband from the rear bedroom, and told another son to call the police. Sovanna Prak was in the kitchen when she saw one of the suspects wearing a mask and standing on a small end table on the front porch. As this suspect proceeded to force his way through the front kitchen window and into the kitchen, Sovanna Prak's husband, Brown Nong, arrived in the kitchen. Either just before, during, or almost immediately after the individual entering the residence, later identified as Sokhean Keo, entered the kitchen a long barrel shotgun was pushed into the open window by a second individual, possibly the defendant. A shot was fired into the kitchen ceiling by the individual holding this shotgun. At this point, victim Nong returned fire with his handgun towards Keo who had taken approximately two steps after gaining entrance into the kitchen. He was struck in the chest, tried to leave the residence by other doors, could not, and shortly fled the residence by crawling through the kitchen window. The defendant was outside of the residence and likely helped pull Keo back through the kitchen window. Once Keo was outside of the residence, additional rounds were fired by the responsibles from the front yard of the home through the living room window into the residence. There were one or two shotguns and a .9 mm pistol used by the defendant and co-responsibles during the commission of the crimes. This conclusion is based on physical evidence inside the house, and the discovery of expended cartridges on the outside sidewalk area adjacent to the residence. Sovanna Prak and other family members laid on the floor in the living room in order to avoid the weapons fire, and then she and her children ran into the rear bedroom where they locked themselves for safety until the police arrived.

During subsequent interviews with Sovanna Prak and Brown Nong, they indicated they were both afraid and scared to death. Victim Brown Nong stated at the time of the offense he did not know if he was being robbed or if the subjects were attempting to murder him or his family. Brown Nong further described how he was yelling at some family members to escape to the back bedroom and other family members in the living room to stay on the ground to avoid the possibility of being struck by flying bullets. Brown Nong stated he was unable to identify any of the intruders and had no idea why he would be the target of such an attack.

Approximately 20 to 25 minutes after the entry, officers received information from Doctors Medical Center Emergency Room that several individuals appeared at the emergency room with an individual who was the victim of a gunshot wound. Officers responded immediately and detained two subjects. As police officers were preparing to leave the hospital, hospital security pointed out a vehicle with several

3

J.  **431**

PJ. (92)

occupants which had dropped off Keo at the emergency room. This vehicle fit the description of the vehicle seen leaving the scene of the home invasion robbery. The occupants inside the vehicle were also placed into custody at this time. Police officers proceeded to search the vehicle. Inside the vehicle officers observed a large amount of blood near the door handle on the driver's rear side door, and more stains of what appeared to be blood on the black blanket in the back seat. Additionally, one of the individuals who had been arrested from inside the vehicle was found to have blood stains on his shirt. This vehicle was found to belong to Sokhean Keo. Inside Keo's vehicle officers also found duct tape, five pairs of gloves, and dark clothing items which were similar in appearance to those described by the victims as worn by the perpetrators of the crimes.

On March 28, 1998, detectives interviewed the defendant, Sopheap Chhoeung a.k.a. Soda. After providing several different accounts, Chhoeung admitted he was the driver of the Honda, and had been parked in the vehicle near the residence at 2005 River Pine Court, Modesto. He further advised that he had transported co-responsible Keo to Doctors Medical Center Emergency Room for treatment of a gunshot wound. Chhoeung stated the other occupants of the vehicle were Sal Soeun, also known as Sal or "Little Tweeker" and a Hispanic male. All of these individuals were known to the Modesto Police Department as being members of "CMF" or "Crazy Mob Family", a criminal street gang. Chhoeung and Soeun were booked into the Stanislaus County Jail. Keo was subsequently booked into the jail after he was released from the hospital.

There are three identified co-responsibles in this matter. Co-responsible Sokhean Keo appeared Stanislaus County Superior Court on February 19, 1999, and received a commitment to state prison for 32 years. Co-responsible Soheap Chhoeung is scheduled for sentencing on August 13, 1999. The third alleged co-responsible, John Rosenburger is scheduled for jury trial on August 23, 1999.

CRIMINAL HISTORY INFORMATION:

July 11, 1996, Stanislaus County Juvenile Court, 211 PC, 110 days juvenile hall.

December 12, 1997, Stanislaus County Juvenile Court, 496(a) PC, felony, probation, 60 days juvenile hall.

DEFENDANT'S STATEMENT:

The defendant submitted the following written statement:

"I don't know whats going on. I did not commit know crime. At the time of the crime I was wid my mom and some friends I don't remember who I was with because there was a large group because I was drunk. Somebody came in and said Cano got shot. I went to look, somebody said take him to the hospital so I got in the car wid them and left to the hospital. I stayed at the hospital with him. Police came arrested me and took me to the police station and question me. I don't feel it's fair that I'm going to prison for helping a friends when he was hurt.

/d/ 8/2/99                                                   /s/ Sal Soeun"

**432**

4

 P9.(93)

During interview at the Stanislaus County Jail on August 9, 1999, the defendant stated substantially as follows:

The defendant stated he did not participate in the crime for which he was found guilty and did not have anything to add to his written statement.

## VICTIM INFORMATION:

The victim was notified by mail of the Sentencing Hearing pursuant to the provisions of Section 1191.1 of the Penal Code.

Pursuant to the sentencing regarding Sokhean Keo, Deputy Probation Officer Hillari Delgado spoke to Sovanna Prak on February 22, 1999. Mrs. Prak stated that she was "scared—I trembled, shook" during the offense. Mrs. Prak and her daughter stated that family members continue to have nightmares, no longer feel safe in their home or neighborhood. The family has discontinued involvement in the temple and traditional cultural activities for fear of reprisals because of their testimony. Mrs. Prak and her daughter stated they feel isolated. They see people they thought were friends taking sides with the defendants. Regarding possible disposition Mrs. Prak did not wish to define a punishment but repeated her ongoing fearfulness.

## DEFENDANT'S SOCIAL HISTORY:

Family/Personal: The defendant resides at 620 Paradise Road, Modesto, California, R101 and has resided there with his family since moving to Modesto when he was a small child. The defendant is the oldest child of Seang Soeun and Vy Soeun. The defendant has seven younger brothers ranging in age from 16 to 5 years old. None of his brothers or parents have been involved in the criminal justice system. The defendant's family is Cambodian, but he was born in Thailand. The defendant does not remember when he moved to the United States with his family. The defendant does not know what his parents did prior to going to Thailand and the United States. The defendant does not know why he was born in Thailand instead of Cambodia. The defendant's first memories date to attending school at James Marshall in the first grade and living at the Paradise apartments. The defendant informs that his parents raised him, and he has lived in Modesto, and in the apartments at 620 Paradise Road his entire life. Mr. Soeun described growing up in Modesto as "alright". However, he informs that he grew up in the "wrong place" and began "hanging with friends that he met at school". The defendant believes he is in trouble because he has friends who get into trouble. He states that he cannot avoid seeing these people because they are his long-time friends, and they come into his apartment complex everyday. Mr. Soeun reported that his brothers have not been involved in any trouble with the criminal justice system because "I don't want them to follow my footsteps, I don't want them or let them hang with my friends". The defendant spends much of his time going fishing, playing cards, and playing sports. He enjoys basketball, volleyball, and football. The defendant denied that he was the member of any gang. Mr. Soeun believed he was identified as being a member of the Crazy Mob Family "just because I lived at 620 Paradise, and associate with individuals who are involved in the gang".

Medical/Psychological: Mr. Soeun indicated that his health good. The only problem he suffers from is recurring headaches. These headaches occur sporadically, and sometimes last for two days. He does not take any prescribed medication for these headaches. Mr. Soeun did not report suffering from any serious

5

433



pg. (94)

injuries, illnesses, or accidents. Likewise, Mr. Soeun indicated that he has never suffered from any psychological problems, or been under the treatment of a psychologist, nor been described any medication for psychological issues.

Education: The last school which the defendant reported attending was Mark Twain Junior High School in Modesto. The defendant informs that he dropped out of school at age 15 because school work was getting too hard. The defendant claims that he can read, but he has a problem understanding. The defendant took ESL classes when he was in elementary school. Probation records indicate that several attempts were made to have the defendant enroll at continuation and community schools to further his education, but he was resistive.

Military: None.

Marital: None.

Employment/Financial: The defendant has never worked, and has not obtained any job training.

Alcohol/Drugs: The defendant consumed one or two 40 ounce of beers per day when he was in the community. The defendant acknowledges that he smoked marijuana once a day usually in the evening. The defendant denies that he used or experimented with any other drugs.

COLLATERAL INFORMATION:

The following is a review of additional information contained in the defendant's probation file at the Stanislaus County Probation Department. On September 20, 1994, the defendant was referred to the Stanislaus County Probation Department for Section 460(b) PC, and placed on six months formal probation. On May 5, 1998, the defendant was arrested for violation of Section 466 PC and violation of probation. These charges were subsequently dismissed in the interest of justice as the defendant was pending serious charges related to this case.

The defendant was under juvenile probation supervision at the time he committed the current offenses. The defendant's adjustment to probation supervision is deemed unsatisfactory based on his ongoing involvement in criminal activity while under a grant of probation supervision, and non-compliance with terms of probation.

In a Court report to the Stanislaus County Juvenile Court dated December 12, 1997, the defendant admitted association in the "CMF" or Crazy Mob Family gang. The minor reported he stopped "claiming" during the last year. Additionally, the defendant's supervising Deputy Probation Officer Ra Pouv was interviewed and indicated the minor was evasive and avoided contact with the probation officer. The defendant experienced several failures to appear for scheduled appointments to meet with the probation officer. The defendant continuously violated his curfew, work program, and did not attend school. Mr. Pouv stated most of the minor's friends and associates were known gang oriented persons who were also truant from school.

In reviewing the Second Amended Information and the jury verdict forms, there was a discrepancy found in Counts I and II regarding the 12022.53(c) PC enhancements. Although the language in the jury verdict

**434**

6

$\varnothing,(95)$



APPENDIX "K"

Pg. 96

CONFESSION

BROCCHINI:     Okay, it is 3-28-98 and its 0637. Sal, okay. You were just about to tell me
               some truths. Let's go back to that. Before Cano got shot tell me who was in
               the car?

SOEUN:         Me, Soda and Cano.

BROCCHINI:     Okay. Before Soda was in the car who was in the car? Who was in the,
               who's in the car? Cano and then what?

SOEUN:         Cano and me and Soda.

BROCCHINI:     All at the same time?

SOEUN:         Yeah, just been two of 'em, to the house and picked up Vulture and came
               back.

BROCCHINI:     You picked Vulture up over there?

SOEUN:         Um hum. (Yes) That's where he live.

BROCCHINI:     I know that's where he lives. What happened while you were over there?

SOEUN:         Nothing. Nothing happened, just bring back home, then I went with Mop
               gambling, gambling, then they, after that they just left. I don't know where
               they went.

BROCCHINI:     Okay. Here's what..........

BERTALOTTO:    We know.

BROCCHINI:     ........we know. You, Soda and Cano went over ta Tweeker's house........

SOEUN:         Um hum. (Yes)

BROCCHINI:     .......with Jesse.......

BERTALOTTO:    And that other Mexican guy.

BROCCHINI:     .......and some other guy.

SOEUN:         No.

032898     0637 hrs.   RD                              DET. BROCCHINI   07440

pg. (96)

STATEMENT                           Page 2 of 26                           98-27945
8027945z.ss/P

BERTALOTTO:    Oh, don't say no, okay, listen up. We've listened to your bullshit all night.
               Listen up. Go ahead BROCCHINI.

BROCCHINI:     Soda, Cano drove, Soda got out, walked around the front of the car and got
               in the driver's seat. Cano and Sal, Jessie, and another guy, maybe Vulture,
               I don't know, got out and walked towards Tweeker's house.

SOEUN:         _____ (unable to make out the rest of his sentence, he is mumbling).

BERTALOTTO:    He's not done telling you the story.

SOEUN:         If you don't believe me, go ask Mop, for real, ask Mop.

BROCCHINI:     I've asked Mop.

SOEUN:         Ask Mop 'bout what you're saying now that, that I was with Jesse. Ask
               about that.

BROCCHINI:     No, he don't know if you were with Jesse in this car.

SOEUN:         I wasn't, for, come on Jessie, I mean Shorty.

BROCCHINI:     I'm just telling you what I know. Why would these people be lying. Why
               would Soda lie?

SOEUN:         I don't know, maybe scared. I ain't lying. What should I lie for? I just told
               you I don't know.

BROCCHINI:     Cause you're scared. He's, what, what's more scared? To tell the truth that
               he was over here at this home invasion robbery like he did, or to make up a
               lie like you're doing right now.

SOEUN:         '   Come on Shorty, why should I lie for?

BROCCHINI:     Because you're scared.

SOEUN:         That's for you, I just told you.

BROCCHINI:     You were there Sal. What, Sal, let's not, don't lie anymore. You were there.
               You were there, Cano was driving, Soda was in the front seat, you were in the
               backseat with Jesse and somebody.

032898     0637 hrs.   RD                              DET. BROCCHINI   07440

pg, (97)                            

STATEMENT                          Page 3 of 26                          98-27945
8027945z.ss/P

SOEUN:            Can you make a deal with me?

BROCCHINI:        What kinda deal?

SOEUN:            Man if I tell you the truth than just let me go home when everything is.......

BROCCHINI:        I can't, I can't promise you that. I can't. Yeah. So that's the only way you're
                  gonna tell me the truth?

SOEUN:            Let me go home soon.

BROCCHINI:        I can't promise you that, I don't know......

SOEUN:            You know where I'll be at, be at Paradise at my house.

BROCCHINI:        No.

SOEUN:            They were in the same house.

BROCCHINI:        No. Sal, Sal I can't promise you that. I can't make you any promises, but
                  you still have to tell me the truth.

SOEUN:            All I, all I know that, they told me they gonna go do summin, go to some,
                  somebody's house, you know I just went with them, I didn't do nuthin..

BROCCHINI:        That's what we need to get to. Who......

SOEUN:            Then.......

BROCCHINI:        .....who is we?

SOEUN:            Me, Soda, Cano, that's all.

BROCCHINI:        Who else?

SOEUN:            That's all.

BROCCHINI:        Who?

BERTALOTTO:       Now....

032898      0637 hrs.    RD                              DET. BROCCHINI    07440

Pg.(99)

STATEMENT                         Page 4 of 26                         98-27945
8027945z.ss/P

BROCCHINI:      Who? Pisith?

BERTALOTTO:     No he said that's all.

SOEUN:          That's all. Three of 'em. So two really.

BROCCHINI:      No, there's witnesses, they are not even people, people driving by that, after
                the shooting happen they saw Cano and they saw 4 people running towards
                the car.

SOEUN:          Yeah, that's.......

BROCCHINI:      Four people, not three.

SOEUN:          Yes.

BERTALOTTO:     You guys stop by the ah, the a liquor store, Paradise Liquor, and picked up
                two Mexican guys?

SOEUN:          No, ah.......

BROCCHINI:      Okay, then you tell us what happened? Give us your version.

SOEUN:          Okay, look, this, this is true.

BROCCHINI:      Okay, give me the truth.

SOEUN:          Me, this is it, this is real, that's what Cano call me.

BROCCHINI:      That's is by who?

SOEUN:          Cano.

BROCCHINI:      Okay Cano called.

SOEUN:          He told me, he called and he told me that we, you know, gonna go do
                something and they told me to come over and watch the car, drive the car, he
                said go round, then you know, I just went.

BROCCHINI:      Who, who did ya go with?

032898      0637 hrs.   RD                              DET. BROCCHINI   07440

pg. (99)

STATEMENT                          Page 5 of 26                          98-27945
8027945z.ss/P

SOEUN:              Cano.

BROCCHINI:          And who else?

SOEUN:              Cano and Soda, that's all.

BROCCHINI:          There was more than three people there.

SOEUN:              No my story, if I was there.

BERTALOTTO:         Okay go ahead tell us what happened.

BROCCHINI:          Okay, go ahead.

BERTALOTTO:         We'll say there's three people. You tell us what happened?

BROCCHINI:          What, what did ya do when you got there?

SOEUN:              I stay in the car. Stayed in the car.

BROCCHINI:          And then what........

SOEUN:              And all of a sudden I heard gunshots and came running back with a wound
                    and then I know, just took him to the hospital.

BERTALOTTO:         Where was Soda?

SOEUN:              With us, he went with us.

BERTALOTTO:         (Unable to make out what he is saying)

BROCCHINI:          Not everybody went with 'em, I mean not everybody stayed in the car?

BERTALOTTO:         Soda said he stayed in the car. He said that you and Cano and the two
                    Mexicans guys went.

SOEUN:              He, he played me off.

BROCCHINI:          He played you off, and are you playing him off?

SOEUN:              No, he played me off, cause I did get out the car but I didn't do nuthin

032898     0637 hrs.   RD                          DET. BROCCHINI     07440

pg.(100)

STATEMENT                    Page 6 of 26                    98-27945
8027945z.ss/P

    though, I just went look at the front yard and I just went back, stand by the
    car, that's all I did.

BROCCHINI:    Okay. Who else went up to the front?

SOEUN:    The, them two.

BERTALOTTO:    No, more.

SOEUN:    _____ come on man.

BERTALOTTO:    Hey, you afraid the Mexicans are gonna come after you or what?

SOEUN:    What Mexicans? There ain't no Mexican.

BROCCHINI:    What about Jesse?

SOEUN:    Jesse? I don't know Jesse.

BROCCHINI:    So you're saying there was only 3 of you guys that went to that house?

SOEUN:    Yeah there was three.

BROCCHINI:    That went to that house?

SOEUN:    Um hum. (Yes)

BROCCHINI:    What happened when you got up to that house?

SOEUN:    I don't know, that's the problem. So I went and asked them, what happened.

BROCCHINI:    You were there, you said you went up to the front yard.

SOEUN:    I went up to the front yard but..........

BROCCHINI:    Okay, what happened, what did you see when you got up to the front yard?

SOEUN:    In the front yard I see, you know, just doors, doors and windows of the house,
    you know, went back to the car and told 'em, you know, blah, blah, and they
    went.......

032898    0637 hrs.    RD                          DET. BROCCHINI    07440



| STATEMENT | Page 7 of 26 | 98-27945 |
|---|---|---|
| 8027945z.ss/P | | |

BROCCHINI:    Okay, wait a minute, wait a minute. See, I missed summin there.

SOEUN:    Alright.

BROCCHINI:    So you went up by yourself?

SOEUN:    Yes, just went up and just told me........

BROCCHINI:    And you looked?

SOEUN:    They just told me to look, you know. Just look..

BROCCHINI:    Well how, how did it look?

SOEUN:    It just look like a house.

BROCCHINI:    Was it dark, light?

SOEUN:    Dark.

BROCCHINI:    Did you think anybody was inside?

SOEUN:    I don't know. I just went back I just told 'em I don't know and then (unable to make out the rest of his sentence, he is mumbling).

BROCCHINI:    Okay, so you, they were parked, you went up to the house and kinda just checked it out?

SOEUN:    Um hum. (Yes)

BROCCHINI:    When you were up there did you see anybody?

SOEUN:    *    (Can't heard any verbal response).

BROCCHINI:    Okay then you checked it out, did you try the door knob?

SOEUN:    No I, I didn't try the door, I just went in the front yard, stand right there, stood there like this.

BROCCHINI:    Okay, and then what did you tell 'em when you got back?

032898    0637 hrs.    RD                          DET. BROCCHINI    07440

B. (102)

| STATEMENT<br>8027945z.ss/P | Page 8 of 26 | 98-27945 |

SOEUN:           Nuthin.

BROCCHINI:       What did you say?

SOEUN:           I said that, that nobody, nobody is.......

BERTALOTTO:      Remember the shoe print we were talking about and you, when you said you weren't there and we told you we had the shoe print right?

SOEUN:           That was, come on man. Why you saying that is my shoe print if I didn't........

BERTALOTTO:      Why'd you say earlier you weren't even there? You were at 620 playing a game?

SOEUN:           Man.

BROCCHINI:       Come on Sal.

SOEUN:           Shorty your trying to mess me up.

BROCCHINI:       I'm not trying to mess you up, I'm trying to get the truth. We gotta go through about 15 layers of lies to get to any one truth.

BERTALOTTO:      There you are. There's a couple of Mexican guys who are gonna lay it off on the Asians. I wouldn't be protecting them.

BROCCHINI:       Okay, so you're saying it was just the three?

SOEUN:           All I wanna do is go home now, I don't even wanna be involved in this.

BROCCHINI:       Well that, that was a mistake. I'm sure it was a mistake you don't want to be involved in it, but let's get to the bottom of it. After you checked out the house you went back and told Cano and Soda something. What did you tell 'em?

SOEUN:           I just told 'em that its clear.

BROCCHINI:       Its clear?

SOEUN:           Yeah.

032898     0637 hrs.   RD                                    DET. BROCCHINI   07440

(9.(103)                                         SCANNED

| STATEMENT<br>8027945z.ss/P | Page 9 of 26 | 98-27945 |
|---|---|---|

BROCCHINI:      Then what happened?

SOEUN:          Then they just went. I don't know what happened.

BROCCHINI:      You walked up there with them. Cause grandma and a kid looked out and said, actually one person saw 4 people and two people saw 3 and you're saying there was only 3, so that means you had to have been up there.

SOEUN:          No.

BERTALOTTO:     We gave you the option to tell us about these Mexicans and you say there is no Mexican guys. There's only 3 people in the car.

SOEUN:          I don't know..

BERTALOTTO:     The lady in the house sees three people.

BROCCHINI:      A lady and her kid both saw three people on their front porch, kinda laying down, or squatting down or something. Laying by the bushes.

SOEUN:          You guys let me go home.

BROCCHINI:      I can't let you go home Sal.

SOEUN:          Make a deal with me or something.

BROCCHINI:      I can't, I can't make you a deal.

BERTALOTTO:     I don't know that you're telling us the truth yet.

SOEUN:          Make a deal with me I'll tell you the truth.

BROCCHINI:      Well you gotta make, tell me the truth.

BERTALOTTO:     That means you're not telling us the truth then?

BROCCHINI:      You gotta tell me the truth Sal

SOEUN:          I wanna go home.

BROCCHINI:      Well I wanna go home too, but we're not gonna get this over with until I get

032898      0637 hrs.    RD                              DET. BROCCHINI    07440





STATEMENT                         Page 10 of 26                        98-27945
8027945z.ss/P

                              the truth.

SOEUN:              But I just told you the truth.

BROCCHINI:          I've been letting people go home after I heard the truth, some people.

SOEUN:              Why you just held me back for?

BROCCHINI:          I had to because you lied to me.

SOEUN:              Lied about what?

BROCCHINI:          You told.........

BERTALOTTO:         About not being there.

BROCCHINI:          About not being there, now you're telling me, at least you're telling me you
                    were there. Tell me the whole truth.

SOEUN:              Cause you'll give me more time.

BROCCHINI:          I'm not gonna give you more time. I'm not going to give you any........

SOEUN:              Your gonna lock me up, that's what you gonna do.

BROCCHINI:          Well, look, I can't lie to you. I can't lie to you Sal. Alright? I don't
                    determine the time. You are gonna get locked up.

SOEUN:              How much, how long?

BERTALOTTO:         You said earlier.......

BROCCHINI:          No, no........

BERTALOTTO:         ........you did the crime, you do the time. You told us that.

BROCCHINI:          We can't, you know what? The time will depend on you. I mean.......

BERTALOTTO:         You feel bad about what happened?

SOEUN:              Yeah, I mean.

032898     0637 hrs.   RD                                DET. BROCCHINI   07440

SCANNED



STATEMENT                    Page 11 of 26                         98-27945
8027945z.ss/P

BERTALOTTO:     You feel remorseful?

SOEUN:          Yeah.

BERTALOTTO:     About what happened?

BROCCHINI:      Well then you come...........

BERTALOTTO:     Well you gotta come across with that.

BROCCHINI:      You gotta come clean.

BERTALOTTO:;    You gotta tell us we didn't plan it this way.  It was supposed to go this way.
                I feel bad, cause this happened.  You gotta show you feel bad that this
                happened to these people.  That this happened to Cano.  You wanna reduce
                your time.

SOEUN:          To tell you the truth I really don't know.  I was in the, I was just standing  by
                the car, I heard gunshots.

BROCCHINI:      Well you know what Sal, that's not gonna fly.  There's, we canvassed the
                neighborhood.  Det. BERTALOTTO was one of the officers that went and
                knocked on every door on River Pine and Pine Tree.  Several people said 4
                people ran from the house after the shooting to the car.  Nobody was.........

BERTALOTTO:     People are shooting, they look out the windows.

BROCCHINI:      Yeah, nobody was standing by the car.  They hear gunshots, they look out the
                window.

BERTALOTTO:     They got a guy standing down at the end of the street that one of the first cops
                on scene talked to who said he didn't even know if anybody was in the car
                and then all of a sudden the car started up and took off.

BROCCHINI:      And took off.

BERTALOTTO:     After the guys had ran there.

BROCCHINI:      So you can't, you can't stick to a story that we're gonna punch a million holes
                in.  Just, you've already told me that you'll tell me the truth if I make you a
                deal.  Well I can't make you a deal, but you can still me the truth Sal.  If you

032898    0637 hrs.   RD                              DET. BROCCHINI   07440

 

STATEMENT                          Page 12 of 26                          98-27945
8027945z.ss/P

know the truth you gotta tell it. We already have Soda's side of the truth. Soda's side of the truth might not be true, but Soda's side of the truth implicates you pretty badly, so now its your turn to give me your side of the truth. Come in Sal. Come on.

BERTALOTTO:     Do you know Soda had a hurt ankle?

SOEUN:          Hum?

BERTALOTTO:     You know Soda's ankle was hurt?

SOEUN:          Yeah, I think it was like.........

BERTALOTTO:     On Monday or Tuesday or something he was chased by a dog or........

SOEUN:          Yeah.

BERTALOTTO:     ........fell down.

BROCCHINI:      Did you fire the gun?

SOEUN:          I didn't hold the gun, for real.

BROCCHINI:      Well I don't know if I can believe you yet, cause you say a lot of things for real, on my mother and then pretty soon you tell me the truth. Did you fire a gun?

SOEUN:          Um um. (No)

BROCCHINI:      Then you tell me who did, you were there?

SOEUN:          I don't know.

BROCCHINI:      Sal.......

SOEUN:          Why don't you ask Soda that, why don't you ask, ask Sopeap that?

BROCCHINI:      I did ask Soda that.

SOEUN:          What did he say?

032898     0637 hrs.   RD                        DET. BROCCHINI   07440

PB (107)

STATEMENT                          Page 13 of 26                          98-27945
8027945z.ss/P

BROCCHINI:      I'm not going to tell you everything he told me.

SOEUN:          No, no.

BROCCHINI:      I'm telling you right now, he implicated you pretty good.

SOEUN:          Um um (no), I don't know.  I don't know nuthin, true.  I heard this gunshot and I just ran.

BERTALOTTO:     And you got in the, did you get behind the wheel?

SOEUN:          Driving?

BERTALOTTO:     Yeah.

SOEUN:          Um hum. (No)

BERTALOTTO:     Who got behind the wheel?

SOEUN:          Soda, and then next Pisith?

BERTALOTTO:     Earlier you said Cano told you to drive.

SOEUN:          No.

BERTALOTTO:     Didn't you say Cano told you to drive and you stayed in the car?

SA L:           No he said, in case, just in case.

BROCCHINI:      In case?

BERTALOTTO:     Just in case?

SOEUN:          That something would happened, but he didn't drive.

BROCCHINI:      Okay, so after the shots where did you sit in the car?

SOEUN:          Backseat.

BROCCHINI:      Who else sat in the backseat?

032898      0637 hrs.    RD                          DET. BROCCHINI   07440

| STATEMENT<br>8027945z.ss/P | Page 14 of 26 | 98-27945 |

SOEUN:              Me.

BROCCHINI:          By yourself? Where'd Cano sit?

SOEUN:              Back.

BROCCHINI:          Well who sat in the front?

SOEUN:              Ah, it was Sopeap, Sopeap was driving and Cano in the back lying down and
                    I was holding him.

BERTALOTTO:         There was a guy in the front seat, passenger side. You have to come across
                    with this or, so you're not being, you're story is not believable. You want us
                    to buy this you gotta come........

SOEUN:              I don't know.

BROCCHINI:          Why are you, why are........

BERTALOTTO:         You know.

BROCCHINI:          ........protecting this person? Why are you, nobody else is protecting him.

BERTALOTTO:         Nobody is protecting you.

BROCCHINI:          The only person that can protect you is you. Everybody else is trying to
                    divert attention from themselves and they're saying whose in the car. Why
                    are you protecting this person, Sal?

SOEUN:              I don't, I don't know that Mexican name. Cause I didn't, didn't know him.
                    I know he's a Mexican though.

BROCCHINI:          Where does he live?

SOEUN:              I don't know, never knew him. That's, that's the problem.

BROCCHINI:          Who else was in the car?

SOEUN:              That, that four.

BROCCHINI:          Soda, a Mexican, you and Cano?

032898      0637 hrs.    RD                                        DET. BROCCHINI    07440





| STATEMENT | Page 15 of 26 | 98-27945 |
|---|---|---|
| 8027945z.ss/P | | |

SOEUN:          Um hum. (Yes)

BROCCHINI:      And that's it?

SOEUN:          Um hum. (Yes)

BROCCHINI:      Nobody else? There wasn't two Mexicans?

SOEUN:          Um um (no) just one.

BROCCHINI:      Okay, so that means all four of you went up to the house? Who didn't go up to the house?

SOEUN:          Me.

BROCCHINI:      Where'd you stay?

SOEUN:          By the, like, you know where the tree is at? Stand by the bushes.

BROCCHINI:      Why didn't you go up to the house?

SOEUN:          The guy just go to the house.

BROCCHINI:      So you were just watching?

SOEUN:          Um hum. (Yes)

BROCCHINI:      Tell me what you saw?

SOEUN:          Gunshot, I hear a gunshot .

BROCCHINI:      Well yeah, but I wanna know what you saw.

SOEUN:          Can't see nuthin.

BROCCHINI:      You're standing by the tree and you're looking at the house, you can see a lot.

SOEUN:          The bush, see this bush is ang----, like angled right here, you can't see nothing. There's a door that's like, like this right here.

BERTALOTTO:     How did Cano get in the house?

032898    0637 hrs.   RD                                     DET. BROCCHINI   07440

SCANNED



| STATEMENT<br>8027945z.ss/P | Page 16 of 26 | 98-27945 |

SOEUN:          Hum?

BERTALOTTO:     How did Cano get in the house before he got shot?

SOEUN:          I don't know. So I was asking them, how did he get shot? Man I'm going to do time for this.

BROCCHINI:      How old are you?

SOEUN:          18.

BERTALOTTO:     How old is Soda?

SOEUN:          I don't know.

BROCCHINI:      20.

SOEUN:          Can you guys just give me a break?

BROCCHINI:      What, what you want, what would be a break for you?

SOEUN:          Let me go home.

BROCCHINI:      And then what?
SOEUN:          Then I would come in line.

BERTALOTTO:     Next thing we know you're in Texas or .........

BROCCHINI:      Or Idaho.

BERTALOTTO:     .......you've already lied to us.

SOEUN:          Um um (no), I wouldn't, I wouldn't, I wouldn't run nowhere. Real. No place.   You couldn't break me no slack?

BROCCHINI:      Well you got some explaining to do. Where's those guns? You know, if I could recover those guns.

SOEUN:          But I didn't, I didn't hold no gun. How should I know where.......

BROCCHINI:      I didn't say you did, but you know where they are.

032898      0637 hrs.   RD                          DET. BROCCHINI   07440



| STATEMENT<br>8027945z.ss/P | Page 17 of 26 | 98-27945 |

SOEUN:          Um um. (No)

BROCCHINI:      Okay then........

BERTALOTTO:     You wanna talk about getting a deal, that's the way you can work that.

BROCCHINI:      I can go to the DA and say look, this dude came clean. He even told me where the guns were, so they're not gonna, out there hurting anybody else. I have something to go to him with. I can't promise you anything, but I'll have some bait or some meat I can........

SOEUN:          But I'm still getting locked for longer.

BROCCHINI:      I, I don't know about long.

BERTALOTTO:     Giving up those guns would be a good thing........

SOEUN:          But how can I give it up if I don't where, where its at.

BERTALOTTO:     Okay.

SOEUN:          They just.......

BROCCHINI:      After you drove away what happened?

SOEUN:          After we came back, Cano got shot, came, came back to ah to Paradise.

BROCCHINI:      Did you drive straight to Paradise?

SOEUN:          Yeah.

BROCCHINI:      Or did you stop anywhere?

SOEUN:          Just Paradise, to Paradise and then Soda got off, he ran, you know, to give the, the gun to somebody I don't know.

BROCCHINI:      Soda did?

SOEUN:          Yeah.

BROCCHINI:      Which gun?

032898      0637 hrs.   RD                              DET. BROCCHINI   07440

Pg.(113)

STATEMENT                      Page 18 of 26                        98-27945
8027945z.ss/P

SOEUN:          I, I don't know which gun.

BROCCHINI:      What'd it look like? Big, little?

SOEUN:          Little. Then I, only me, me and that Mexican dude_____ and me came
                back, that's it.

BERTALOTTO:     You're lying. The Mexican dude didn't go back to 620.

SOEUN:          Come on man.

BERTALOTTO:     No come on man. You're lying to me. The Mexican didn't make it back to
                620.

BROCCHINI:      He got out before 620.

SOEUN:          Then I don't know then.

BROCCHINI:      Huh?

SOEUN:          Then I don't know. Then he musta had the gun then if he didn't go back to
                620.

BROCCHINI:      We'll you'd know. Did he go back to 620?

SOEUN:          I just told you that we went straight to 620, we didn't stop nowhere. Plus I
                don't know who, who, who fired the gun.

BERTALOTTO:     That's okay. Where were the guns kept when you drove over there?

SOEUN:          Hum?

BERTALOTTO:     When you drove to by Tweeker's house and parked the car and went over to
                do that thing.

SOEUN:          Mexican dude.

BERTALOTTO:     Where were the guns kept?

SOEUN:          The Mexican was holding 'em, holding one of them.

032898    0637 hrs.    RD                              DET. BROCCHINI    07440

PG.(114)

STATEMENT                            Page 19 of 26                            98-27945
8027945z.ss/P

BERTALOTTO:        What kinda gun was it?

SOEUN:             Small auto kind, small black one.

BERTALOTTO:        Handgun?

SOEUN:             I think so.

BERTALOTTO:        Who had the other gun?

SOEUN:             He, its his, both of 'em is his.

BERTALOTTO:        What, well what kinda gun was it?

SOEUN:             Small, both of 'em is small.

BERTALOTTO:        What about the shotgun?

SOEUN:             Shotgun?

BERTALOTTO:        Yeah.

BROCCHINI:         Somebody had a shotgun.

BERTALOTTO:        We recovered pellets and we recovered a wadding that was shot out of a
                   shotgun.

SOEUN:             Didn't hear any shotgun. Yeah, yeah, yeah, it musta been with the back, ah,
                   with the trunk, then he went, he placed it under a bush by ah Tweek,
                   Tweeker's house.

BROCCHINI:         He put it under a bush by Tweeker's house?

SOEUN:             Um hum. (Yes)

BROCCHINI:         After the shooting, or before?

SOEUN:             After we, were and looked at the house.

BROCCHINI:         Okay. What happened to it after the shooting?

032898      0637 hrs.   RD                              DET. BROCCHINI   07440

PR. (115)

STATEMENT                          Page 20 of 26                          98-27945
8027945z.ss/P

SOEUN:        I don't know, he just took the gun and just got out and I just hold onto to
              Cano. I don't know where the Mexican dude went, or the gun.

BERTALOTTO:   And you say there was only one Mexican guy?

SOEUN:        There was only one.

BROCCHINI:    That means all 4 of you guys walked up to the house.

SOEUN:        Yeah we walked up, but I didn't do nothing.

BROCCHINI:    Okay.

BERTALOTTO:   Where did ah, on the way back, and we already know the answer to this.
              Where did they drop the Mexican guy off at?

SOEUN:        That's, that's the problem. I don't know where the Mexican, the dude went.

BERTALOTTO:   Okay, did they stop somewhere and let him out?

SOEUN:        Yeah I think so. At a gas station.

BERTALOTTO:   Okay.

SOEUN:        Somewhere at a gas station.

BERTALOTTO:   Along what road?

SOEUN:        Um, by the school, coming off of Pizza Hut.

BERTALOTTO:   On Paradise?

SOEUN:        Pizza Hut?

BROCCHINI:    Um hum. (Yes)

BERTALOTTO:   Um hum. (Yes)

SOEUN:        Yeah, at that school, right next to it.

BERTALOTTO:   Um hum. (Yes)

032898    0637 hrs.   RD                          DET. BROCCHINI    07440

 

STATEMENT                    Page 21 of 26                    98-27945
8027945z.ss/P

SOEUN:           Then just go by Paradise.

BERTALOTTO:      Where? At Burbank School?

SOEUN:           Yeah I think Burbank. The gas station next to it.

BERTALOTTO:      Um hum. (Yes)

SOEUN:           Just stop real quick.

BERTALOTTO:      You're saying Soda went to the house too?

SOEUN:           Me, me and Soda was, was standing close together.

BROCCHINI:       Anybody like lay down or squat down?

SOEUN:           Only the Mexican dude and Cano lay down.

BROCCHINI:       Only the Mexican dude and Cano?

SOEUN:           Yeah and Cano. But Cano (unable to make out the rest of his sentence, he is
                 talking too fast and mumbling). Then all of a sudden I heard a gunshot and
                 we just ran. And I heard Cano.

BROCCHINI:       Cano got hit in the house, so you can't say, he.........

BERTALOTTO:      Cano was shot inside the house.

BROCCHINI:       ........he was inside the house when he got shot.

BERTALOTTO:      We got his blood in the house. When he came back out the window.

BROCCHINI:       '   He jumped in the kitchen window.

SOEUN:           Yeah

BERTALOTTO:      So don't go stringing us along, we know things you know.

SOEUN:           ......I think that, that the Mexican dude break the window.

BERTALOTTO:      The Mexican dude did?

032898      0637 hrs.    RD                      DET. BROCCHINI    07440

9.(117)            CONVICTED

STATEMENT                    Page 22 of 26                    98-27945
8027945z.ss/P

SOEUN:              Um hum. (Yes)

BROCCHINI:          With what?

SOEUN:              I don't know.

BROCCHINI:      .   Okay.

SOEUN:              Then I don't know how Cano got in.

BROCCHINI:          How do I find this Mexican dude?

SOEUN:              I don't, I don't know.

BERTALOTTO:         You don't know, you don't know?  You keep telling us you don't know, but
                    then you keep knowing.

BROCCHINI:          You don't know a street?

SOEUN:              No.

BROCCHINI:          Come on, tell me the street name Sal.

SOEUN:              I don't know.

BERTALOTTO:         You guys aren't just gonna just pick any Mexican guy you don't know and
                    take with you on a job.

BROCCHINI:          Is he a Serrano or Norteno?

SOEUN:              I don't know them, they ain't my friends.  Why don't you asked the people,
                    they might know them.  I don't know.

BROCCHINI:          Yeah you do.  Okay.

BERTALOTTO:         Did Cano know him?

SOEUN:              Hum?  I don't know.  I never seen him.  He one of their friends one of them
                    knows.

BERTALOTTO:         You don't know if Cano knew the guy?  He hide in Cano's car?

032898    0637 hrs.   RD                              DET. BROCCHINI    07440



STATEMENT                          Page 23 of 26                          98-27945
8027945z.ss/P

SOEUN:          Yeah I think he's one of their friends.

BERTALOTTO:     Where'd you pick him up at?

SOEUN:          I think.........

BERTALOTTO:     Don't tell me what you think. Tell me what you know.

SOEUN:          Paradise, Paradise.

BERTALOTTO:     Paradise? By where?

SOEUN:          Right, at Paradise.

BERTALOTTO:     At 620?

SOEUN:          Um hum. (Yes)

BERTALOTTO:     Was he over there playing games with you guys or what? Mexicans don't
                hang out there with you guys?

BROCCHINI:      You know this guy from juvenile hall or from jail?

SOEUN:          I never knew that guy.

BROCCHINI:      No?

BERTALOTTO:     Was he dressed blue, red? What was his thing?

SOEUN:          Just had _____.

BERTALOTTO:     Well, you're not gonna take some bum on a job with you like this. You gotta
                take somebody you can count on, somebody you know.

SOEUN:          I said he's, just like a bum, ragety clothes, I didn't say he was a bum.

BROCCHINI:      This the first one you've gone on?

SOEUN:          Hum?

BROCCHINI:      Is this the first one robbery you've gone on?

032898     0637 hrs.    RD                              DET. BROCCHINI    07440



| STATEMENT<br>8027945z.ss/P | Page 24 of 26 | 98-27945 |
|---|---|---|

SOEUN:    First thing?

BROCCHINI:    Robbery. First one, have you ever, did you do one last week?

SOEUN:    Like robbed a house?

BROCCHINI:    Yeah.

SOEUN:    Uh uh. (No)

BROCCHINI:    You know one I was talking to you about last week?

SOEUN:    Where?

BROCCHINI:    The one over there at 620 Paradise, a woman got her head split open.

SOEUN:    Oh that, I don't know.

BROCCHINI:    You weren't part of that?

SOEUN:    Naw huh. I told you already.

BROCCHINI:    So this is the first one you went and helped on?

SOEUN:    Yeah I just, I just, I didn't even help.

BROCCHINI:    Well you kinda just went along?

SOEUN:    Yeah, I just went along. If I tell you the story_____.

BROCCHINI:    Now you gotta tell me where the gun is.

SOEUN:    I don't know, I told ya...

BROCCHINI:    You said Soda ran and put it somewhere, or one of 'em?

SOEUN:    Yeah, remember I told you the we dropped that Mexican dude off

BROCCHINI:    Yeah.

SOEUN:    They stopped, he took all the straps with him.

032898    0637 hrs.    RD                    DET. BROCCHINI    07440

STATEMENT                           Page 25 of 26                          98-27945
8027945z.ss/P

BROCCHINI:      He took 'em all?

SOEUN:          Um hum (yes) all of, all of it.

BERTALOTTO:     How many guns total?

SOEUN:          I think three or two.

BERTALOTTO:     No you told me about two handguns, its falling back.   You told me a
                shotgun?

SOEUN:          I don't know.  I saw him with two, two guns, but I didn't know who got a big
                one in the back in the trunk.

BERTALOTTO:     How did he put that in the back?

SOEUN:          Don't ask me, I don't know.  I just got in the car.

BERTALOTTO:     And you don't?  You was with him, right?

SOEUN:          Yeah I was with him, but I wasn't all day though, I just, they came, they call
                me.  I went, I just got, I just got in the mix, you know how it is Shorty?

BROCCHINI:      I know, you kinda caught up in that shit.

SOEUN:          Yeah I got caught up with it.

BROCCHINI:      Well I been trying to warn ya about the gang life.

SOEUN:          I didn't even wanna do the gang life.

BROCCHINI:      Well you gotta get out of that.  A lot of your gang buddies are in jail aren't
                they?

SOEUN:          I don't wanta miss New Year.

BROCCHINI:      Well most.  It is 7:02 I'm gonna end this tape.

032898      0637 hrs.   RD                          DET. BROCCHINI   07440

pg.(121)

STATEMENT                          Page 26 of 26                          98-27945
8027945z.ss/P

pg. (122)

032898        0637 hrs.    RD                              DET. BROCCHINI    07440

## PROOF OF SERVICE BY MAIL

### BY PERSON IN STATE CUSTODY

(Fed. R. Civ. P. 5; 28 U.S.C. § 1746)

I, SAL SOEUN _____, declare:

I am over 18 years of age and a party to this action. I am a resident of PELICAN

BAY STATE _____ Prison,

in the county of HUMBOLDT,

State of California. My prison address is: P.O. BOX 7500

CRESCENT CITY, Ca 95532

On _____,

(DATE)

I served the attached: FEDERAL WRIT of HABEAS CORPUS

_____

(DESCRIBE DOCUMENT)

on the parties herein by placing true and correct copies thereof, enclosed in a sealed envelope, with postage

thereon fully paid, in the United States Mail in a deposit box so provided at the above-named correctional

institution in which I am presently confined. The envelope was addressed as follows:

CLERK of UNITED STATE District Court for the Northern
District of California, 450 GOLDEN GATE AVE,
BOX 36060 SanFRANCISCO
Ca, 94102

I declare under penalty of perjury under the laws of the United States of America that the foregoing

is true and correct.

Executed on 12-30-07                    _____

(DATE)                                         (DECLARANT'S SIGNATURE)

Civ-69 (Rev. 9/97)                                   ::ODMA\PCDOCS\WORDPERFECT\22832\1

-9-